**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:18-cv-00550-WJM-NRN

RACHEL BRAYMAN, individually
and on behalf of all other similarly
situated individuals,

        Plaintiffs,

v.

KEYPOINT GOVERNMENT SOLUTIONS,
INC., a Delaware corporation,

        Defendant.

---

**DEFENDANT KEYPOINT GOVERNMENT SOLUTIONS, INC.'S
AMENDED MOTION FOR DECERTIFICATION[1]**

---

KeyPoint Government Solutions, Inc. ("KeyPoint") moves the Court to decertify the nationwide collective of Field Investigators ("Plaintiffs") that the Court conditionally certified on August 7, 2019, under the Fair Labor Standards Act ("FLSA"). (ECF No. 218.)

## I.      INTRODUCTION

Though Plaintiffs managed to obtain conditional certification, they have utterly failed to establish that they are similarly situated, or that Defendants knew or should have known that Plaintiffs were working off-the-clock; and it is indisputable that the Plaintiffs' alleged damages are truly individualized. Given these issues, decertification is warranted.

---

[1] Defendant files this Amended Motion for Decertification at the Court's direction. (ECF No. 351.)

As discussed more fully below, the FLSA permits a collective action of individuals "similarly situated." 29 U.S.C. § 216(b). At the decertification stage, the Court applies a much stricter "similarly situated" standard than applied at the conditional certification stage, requiring the rigorous review of several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001).[2]  Applying these factors here, the testimony of the Plaintiffs themselves establishes that the facts of their employment, management settings and alleged reasons for and amount of alleged off-the-clock work are strikingly divergent.

Further, in order to proceed as a collective, Plaintiffs must also show that KeyPoint knew or should have known they were working overtime without compensation pursuant to the same nationwide policy.[3] Not only did each Plaintiff attest on **every** timesheet that all reported time was true and correct, but by Plaintiffs' own sworn deposition testimony, they were never instructed, urged or pressured to work off-the-clock.  Plaintiffs also did not tell anyone they were working off-the-clock, and in a number of instances, they took steps to actively conceal their off-the-clock work.  It defies logic to suggest that there is a nationwide policy or practice requiring off the clock work and that KeyPoint knew nothing about it.

Finally, decertification is also appropriate because Plaintiffs' claims for damages are highly individualized and cannot be managed in a representative manner.[4]

---

[2] *Thiessen* was brought under the Age Discrimination in Employment Act ("ADEA"). The ADEA "expressly borrows the opt-in [collective] action mechanism of the [FLSA], 29 U.S.C. § 216(b)." *Thiessen*, 267 F.3d at 1102.
[3] *E.g.*, *Renteria-Camacho v. DirecTV, INC.*, No. 14-2529, 2017 WL 4619354, at *7 (D. Kan. Oct. 16, 2017) (citing *Whitaker v. Pac. Enters. Oil Co. (USA)*, 956 F.2d 1170 (10th Cir. 1992)).
[4] *E.g.*, *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1009 (D. Kan. 2018) (decertifying collective in which "Defendants' defenses as to each Plaintiff [were] ... highly individualized" such that Defendants would "be required

In the end, the dearth of evidence supporting even an inference of a nationwide policy to discourage accurate time reporting or establishing that the company knew of alleged off-the-clock work, as well as the necessary individualized damages inquiries, compel decertification.

## II.   CERTIFICATE OF CONFERRAL

As required by Local Rule 7.1, undersigned counsel certifies that KeyPoint's counsel conferred with Plaintiffs' counsel regarding this Motion.  Plaintiffs oppose the relief requested.

## III.   PROCEDURAL HISTORY

Plaintiff Rachel Brayman filed this FLSA case on March 8, 2018, alleging a collective action comprised of Field Investigators ("FIs") who claimed KeyPoint failed to pay them for all overtime hours worked pursuant to a single, nationwide policy requiring "off-the-clock" work. One month later, on April 6, 2018, Plaintiffs moved to conditionally certify an FLSA collective action. On August 7, 2019, the Court conditionally certified a nationwide collective of FIs employed by KeyPoint "between March 8, 2015[5] and the present." (ECF No. 69 at 1.) The total size of the collective currently stands at 214. (*See* ECF Nos. 1, 16, 18, 20, 25, 43, 96, 108, 125, 164, 165, 166, 167, 168, 169, 170, 171, 173, 174, 175, 176, 177, 178, 179, 180, 182, 183, 184, 185, 186, 187, 188, 191, 193, 194, 195, 196, 197, 202, 203, 204, 205-1, 206-1, 208-1, 209-1, 211-1, 213-1, 214-1, 221-1, 223-1, 227-1, 228-1, 229-1, 230-1, 231-1, 232-1, 236-1, 237-1, 239-1, 243-1, 245-1, 247-1, 248-1, 249-1, 252-1, 253-1, 254-1, 255-1.) Other than job titles, there is no

---

to call hundreds of Plaintiffs to testify as to their claims...."); *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 934 (E.D. Ark. 2012) (collective treatment is inappropriate where "individualized inquiries would[] have to be conducted to determine whether any of the class members worked off-the-clock during any given week, and if so, how many hours were worked"); *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 942 (D. Minn. 2009) (affirming magistrate's denial of collective certification where plaintiffs gave "very different explanations for being shortchanged").

[5] Ultimately, it was determined that the appropriate back-end date for notice was April 6, 2015. (ECF No. 217 at 10.)

relevant commonality among Plaintiffs, particularly regarding the existence of a nationwide unlawful policy or practice and the highly individualized proof of damages required.

## IV.     FACTUAL BACKGROUND

### A.     KeyPoint's Investigators Provide Investigative Services Remotely.

KeyPoint[6] is headquartered in Loveland, Colorado and provides specialized investigative services to government agencies. (Ex. A, ECF No. 332-1, at 4 (16:7-16).) KeyPoint's Field Investigators ("FIs") work remotely from their homes located across the United States. (*Id.* at 16 (58:4-6); Ex. B, ECF No. 332-2 at 2; Ex. C, ECF No. 332-3 at 2) Upon hire, FIs typically undergo six weeks of training on KeyPoint policies and processes as well as investigative techniques. (Ex. A, ECF No. 332-1 at 5-6 (22:18-23:2).) This training includes best practices for time management and the organization of work. (*Id.* at 15-17 (64:21-66:5).) In training, KeyPoint instructs FIs that all time worked must be recorded. (Ex. D, ECF No. 332-4 at 69.) The training instructs FIs that "submitting the timesheet . . . certifies that all entries are correct as entered and all time is reported as required." (*Id.*) KeyPoint makes clear that compliance with timekeeping policies may be part of performance evaluations, and that violation of the policies may lead to discipline. (*Id.*)

FIs work in geographic Regions and are managed by Field Managers ("FMs").  (Ex. A, ECF No. 332-1 at 13 (57:19-24); Ex. E, ECF No. 332-5 at 3, 12.)  An FM oversees the performance of the FIs assigned to his or her area. (*E.g.*, ECF No. 29-7 at 2, ¶ 6; ECF No. 29-12 at 2 ¶ 6.)  The FIs who have brought or joined this lawsuit as Plaintiffs worked in more than 32 different states and under the supervision of approximately 111 different FMs. (Ex. F, ECF No. 332-6 at 2 ¶¶ 3-4.) Plaintiffs' disparate geographic locations and supervisory chains naturally brought about

---

[6] In November 2018, KeyPoint was renamed Perspecta Risk Decision Inc. (Ex. A, ECF No. 332-1 at3 (13:9-24).)

disparate employment experiences (discussed in detail below).

Work assignments are made by a logistics team. (Ex. A, ECF No. 332-1 at 12-13 (56:25-57:10).) Assignments are task-defined, and each task has an associated "source unit" value, which would be credited to the FI upon completing the task. (*Id.;* Ex. E, ECF No. 332-5 at 5.)[7] For example, conducting and compiling the report of a subject interview is worth 3.5 source units; checking a public or other documentary record is worth ½ a source unit. (Ex. G, ECF No. 332-7 at 3-4 (79:23-80:7).) The number of source units an FI is expected to complete in a week is dependent on the number of hours he or she devotes to field work in that week, where he or she works, and his or her level. (*See* ECF No. 332-1 at 18-19 (91:25-92:22).) A Level I (beginner) FI in a metropolitan area, for example, is expected to complete 17 source units in a workweek in which the FI recorded 40 field work hours. (*Id.* at 18-20 (91:25-93:14.) Time recorded as training, administrative, travel, or time off does not count toward the weekly performance expectation, and FIs' source unit production expectations are reduced accordingly. (*Id.* at 23-24 (98:7-99:24).)

FIs individually determine when to perform their work assignments and how to organize their workday activities (conducting interviews, obtaining records, and drafting and submitting reports).  (*Id.* at 15-17 (64-66); *see also* Ex. H, ECF No. 332-8 at 5 (49:4-9).) FIs have complete discretion to structure their days to accommodate their work activities. (*Id.*)  In other words, an FI could arrange her schedule to take a break in the middle of the day for non-work-related activities. Consequently, the fact that an FI sent an email or answered a phone call one evening is not indicative of the FI working off-the-clock, because the FI could have chosen not to work earlier in

---

[7] A logistics team determines the "source unit value" of FI work assignments. (*Ex. A, ECF No. 332-1* at  21 (94).) Source unit values for particular tasks within an assignment – subject interviews, source interviews, record pulls – remain the same. (*Id.* at 22 (95:1-6).)

the day or week. (Ex. I, ECF No. 332-9 at 7 (42:4-12).) As Plaintiff Whitaker acknowledged, the remote nature of the job, performed in the field and at FIs' homes, would not permit FMs to observe the hours during which FIs chose to work. (*Id.*)

  **B.**   **KeyPoint Unequivocally Requires Employees to Record All Hours Worked.**

  In addition to training on its timekeeping expectations, KeyPoint regularly communicates and reinforces its expectations to FIs through its written policies, its timekeeping software, and individual interactions that FMs have with their FIs.

  **1.**   **KeyPoint's Written Policies Require All Hours Worked to be Reported.**

  FIs must accurately document the work they perform, including accurately recording all hours worked. (Ex. J, ECF No. 332-10 at 7 (4).) To that end, FIs are provided with, and acknowledge receipt of, KeyPoint's Non-Exempt Overtime Reporting Procedure. (*E.g.*, Ex. K, ECF No. 332-11 at 7 (57:12-23); Ex. L, ECF No. 332-12 at 9-10 (45:10-46:5).)  The Handbook[8] clearly states that all employees are  to "accurately record all time worked each and every day" and reminds employees that "[f]ailing to record all time worked is considered to be timecard fraud and is reportable to government agencies as an integrity violation, which could jeopardize your security clearance."  (*E.g.*, Ex. W, ECF No. 332-23 at 2-3, Ex. P, ECF 332-16 at 8-9 (B-5 – B-6); Ex. Q, ECF 332-17 at 8-10 (B-5 – B-6-2); Ex. R, ECF 332-18 at 8-11 (B-5 – B-6-2); Ex. S, ECF 332-19 at 8-10 (B-5 – B-6-2). FIs receive and acknowledge KeyPoint's Code of Business Conduct and Ethics, which emphasizes the importance of accurate time reporting in the context of KeyPoint's contractual relationships with government entities. (*E.g.*, Ex. N, ECF No. 332-14 at 3-

---

[8] In complying with the Court's Order instructing Defendant to update its citations (ECF No. 351 at 3), Defendant noted a typographical error in that the original Motion for Decertification referenced Defendant's Acknowledgement rather than its Handbooks.  Because it was a citation error, Defendant has corrected that here.

4 (44:23-45:20); Ex. J, ECF No. 332-10 at 7.) FIs also receive KeyPoint's Employee Handbook[9], which contains KeyPoint's policies on Recording Work Hours and Overtime Pay. (Ex. S, ECF No. 332-19 at 8-10 (B-5 – B-6-2.)) The Handbook explicitly requires that "all employees must account for **all** hours worked each day." (*Id.* at 9 (B-6-1) (emphasis in original).) KeyPoint requires that FIs receive advance approval to work overtime, but the policy clearly provides that reported overtime will be paid whether preapproved or not. (*Id.*) Employees are similarly responsible for "the accurate reporting of overtime hours and for ensuring that any overtime worked is pre-approved by his/her manager." (*Id.* at 8 (B-5).) Any KeyPoint employee who instructs or encourages another employee to work "off-the-clock" is in violation of KeyPoint's policy. (*Id.* at 9 (B-6-1).) Since 2015, KeyPoint has sent quarterly reminders by email to all employees regarding these requirements. (Ex. A, ECF No. 332-1 at 25 (182:22-24).)

### 2.   KeyPoint's Timekeeping System Requires FIs to Attest to Timesheet Accuracy and Completeness.

Each time an FI signs a weekly timesheet, the FI certifies, "[m]y timesheet is a legal document. By saving this timesheet I agree that I have accurately reported and recorded all hours worked. Failure to do so and/or working overtime without proper authorization may result in discipline up to and including termination."[10]  (Ex. V, ECF No. 332-22 at 2.)[11]

---

[9] KeyPoint has periodically updated its Handbook, and all versions contain the same or similar timekeeping expectations. (Ex. P, ECF No. 332-16 at 8 (B-5), 9 (B-6) (Feb 2014 Handbook); Ex. Q, ECF No. 332-17 at 8 (B-5), 9 (B-6) (Aug 2015 Handbook); Ex. S, ECF No. 332-19 at 8-10 (B-5 - B-6-2 (June 2016 Handbook); Ex. R, ECF No. 332-18 at 8-11 (B-5 – B-6-2) (March 2018 Handbook).)

[10] Until 2016, FIs used KeyPoint's Deltek timekeeping system. (Ex. T, ECF No. 332-20 at 3-4 (17:3-18:1).) Deltek allowed FIs to enter the number of hours worked each day. (*Id.* at 6-7 (57:22-58:23).) FIs received training on how to use Deltek, including the instruction to record all hours worked. (*E.g.*, Ex. U, ECF No. 32-21 at 3 (39:8-11).) From 2016 to early 2020, FIs submitted their timesheets in a system called NetSuite (Ex. T, ECF No. 332-20 at 8 (63:18-22).) which also required that timekeepers certify that each timesheet was complete and accurate. In early 2020, KeyPoint went back to Deltek. (*Id.* at 4-5 (18:25-19:4).)

[11] KeyPoint also provides FIs an opportunity to correct errors. (*Ex.* A, ECF No. 332-1 at 10 (38).) FMs review and approve submitted timesheets weekly. (*Id.* at 7-8 (25:23-26:3).) If a FM discovers an issue, he or she can return the

### 3.      FMs Regularly Remind FIs to Record All Hours Worked.

FIs are frequently reminded of the requirement to record all hours worked, including overtime. For example, Plaintiff Rachel Brayman's FM reminded her team, "to ensure the accurate recording of hours actually worked and leave time taken, all employees must account for **all** hours worked each day . . . All overtime must be approved in advance and in writing by managers and will be paid according to federal and state law." (*Id.*, Ex. W, ECF No. 332-23 at 2.) This FM made clear that it was each employee's responsibility to verify the accuracy of reported hours. (*Id.*) This reminder is typical of similar communications sent by other FMs. (*See, e.g.*, Ex. X, ECF No. 332-24 at 10 (65:3-11), 17 (106:2-9); Ex. Y, ECF No. 332-25 at 2; Ex. Z, ECF No. 332-26 at 2-3; Ex. AA, ECF No. 332-27 at 12 (98:17-99:2), 14 (101:3-24); Ex. BB, ECF No. 332-28 at 2; Ex. CC, ECF No. 332-29 at 2; Ex. DD, ECF No. 332-30 at 2; Ex. EE, ECF No. 332-31 at 2; Ex. FF, ECF No. 332-32 at 2.)[12]

### 4.      KeyPoint Regularly Adjusts Caseloads and Deadlines.

KeyPoint is flexible as to caseloads and deadlines. Plaintiff Anas had cases reassigned to other FIs where travel or other commitments prohibited her from timely completing her assignments. (Ex. HH, ECF No. 332-34 at 9-10 (60:24-61:25).) Plaintiffs Ponce and Hudkins voluntarily moved to lower levels with lower productivity requirements. (Ex. L, ECF 332-12 at 16 (77:9-15), Ex. II, ECF No. 332-35 at 4-5 (46:25-47:3).) Several Plaintiffs acknowledged adjustments to an item's assigned completion date ("ACD"), when they identified a challenge to timely completion. (*E.g.*, Ex. I, ECF No. 332-9 at 11-12 (58:19-59:12); Ex. RR, ECF No. 332-44

---

timesheet to the FI for revision, but cannot modify the timesheet. (*Id.* at 8-9 (26:25-27:7), 11 (40:4-24);  Ex. D, ECF No. 332-4 at 67.)

[12] If an FI has questions regarding timekeeping or overtime compensation, there is an ethics hotline and the Human Resources team is available to discuss those issues. (Ex. A, ECF No. 332-1 at 26-27 (190:18-91:7).)

at 3 (45:5-10) (Q: "And did you sometimes have [ACDs] moved?" A: "Often.").)

### C. Plaintiffs Acknowledge KeyPoint's Timekeeping Expectations.

Plaintiffs consistently acknowledged that KeyPoint's written policies and instructions require **all** hours worked to be recorded. (*E.g.*, Ex. GG, ECF No. 332-33 at 4-8 (37:5-41:21), 9-10 (43:20-44:2), 12-13 (46:24-47:5), 15-16 (51:6-52:4); Ex. H, ECF No. 332-8 at 6-8 (52:10-54:22); Ex. K, ECF No. 332-11 at 3 (25:8-12), 16-17 (85:20-86:11); Ex. X, ECF No. 332-24 at 3 (35:3-15), 11-12 (68:11-69:19); Ex. HH, ECF No. 332-34 at 11-14 (65:1-68:2); Ex. L, ECF No. 332-12 at 5-6 (39:5-40:22);  Ex. II, ECF No. 332-35 at 3 (29:6-17); Ex. JJ, ECF No. 332-36 at 3-5 (31:15-33:19); Ex. KK, ECF No. 332-37 at 3-5 (23:15-25:5); Ex. I, ECF No. 332-9 at 5-6 (36:5-37:9); Ex. LL, ECF No. 332-38 at 3 (31:6-20); Ex. AA, ECF No. 332-27 at 6-9 (85:10-88:18).) Plaintiffs admit that KeyPoint prohibited "off-the-clock" work. (*E.g.*, Ex. H, ECF No. 332-8 at 12 (62:6-20), Ex. GG, ECF No. 332-33 at 15 (51:6-14).) Plaintiffs also admit that KeyPoint required Plaintiffs to obtain advance approval to work overtime. (Ex. L, ECF No. 332-12 at 3-4 (34:20-35:2), 5 (39:5-11); Ex. MM, ECF No. 332-39 at  4 (35), 5-6 (39:13-40:4); Ex. JJ, ECF No. 332-36 at 4-5 (32:20-33:2); Ex. KK, ECF No. 332-37 at 4-6 (24:21-26:22); Ex. I, ECF No. 332-9 at 5 (36:5-16), 8-10 (44:19-46:15); Ex. X, ECF No. 332-24 at 5 (42:6-9).) Plaintiffs understood that their failure to record all hours worked was an integrity violation reportable to the federal government that may jeopardize their clearance to perform security checks for federal government entities. (Ex. H, ECF No. 332-8 at 9-10 (59:18-60:17);  Ex. K, ECF No. 332-11 at 5-6 (39:24-40:12); Ex. X, ECF No. 332-24 at 14-15 (87:23-88:4); Ex. HH, ECF No. 332-34 at 12-14 (66:16-68:2); Ex. II, ECF No. 332-35 at 6 (62:6-15), 11-12 (84:5-85:2); Ex. KK, ECF No. 332-37 at 3-6 (23:2-26:22); Ex. AA, ECF No. 332-27 at 6-7 (85:24-86:20).) Indeed, Plaintiffs themselves attested to the accuracy of

the time that they recorded with every timesheet submission. (Ex. H, ECF No. 332-8 at  11-12 (61:21-62:25), 20 (124:4-22);  see. GG, ECF No. 332-33 at 17 (56:2-6); Ex. K, ECF No. 332-11 at 9 (65:15-25), 17 (86:8-11); Ex. X, ECF No. 332-24 at 15-16 (88:5-89:3); Ex. L, ECF No. 332-12 at 4 (35:13-18), 6 (40:4-10), 11-12 (47:16-48:8); Ex. II, ECF No. 332-35 at  9 (79:15-25), 10 (82:19-23); Ex. MM, ECF No. 332-39 at 9 (62:3-20), 16 (108:1-17); Ex. KK, ECF No. 332-37 at 5-6 (25:6-26:22); Ex. I, ECF No. 332-9 at 6 (37:10-15), 7 (42:4-12); Ex. NN, ECF No. 332-40 at 3 (49:12-22); Ex. AA, ECF No. 332-27 at 15 (102:3-13).) Plaintiff Adriana Ponce and others testified that no employee should create false or misleading records of their time. (Ex. L, ECF No. 332-12 at 7 (42:18-21), 11 (47:16-24); *see also* Ex. II, ECF No. 332-35 at 9 (79:15-20); Ex. I, ECF No. 332-9 at 4 (33:10-20).)

      **D.**      **Plaintiffs Followed KeyPoint's Timekeeping Expectations.**

Plaintiffs regularly requested and received manager approval to work overtime. (Ex. H, ECF No. 332-8 at 15 (72:4-12); Ex. GG, ECF No. 332-33 at 14 (50:13-19), 19 (67:5-13), 20 (70:16-24); Ex. HH, ECF No. 332-34 at 17 (98:11-16), 18 (102:17-104:9), 23 (132:14-19); Ex. II, ECF No. 332-35 at 7-8 (75:17-76:11), 17 (103:5-9); Ex. MM, ECF No. 332-39 at 5-6 (39:19-40:4), 13 (83:1-17); Ex. OO, ECF No. 332-41 at 3-4 (24:11-25:21), 10 (67:3-5); Ex. AA, ECF No. 332-27 at 17 (105:17-20).) Plaintiff Tyson Blair described a standing policy in place by one of his FMs to permit several hours of overtime per week. (Ex. GG, ECF No. 332-33 at 20 (70:16-24); Ex. PP, ECF No. 332-42 at 1.) Blair could not identify an occasion on which another FM rejected a request for overtime within the first year of his employment. (Ex. GG, ECF No. 332-33 at 21-22 (73:24-74:2).) Plaintiff Marcia Eames could not identify one instance where an overtime request was rejected (Ex. K, ECF No. 332-11 at 12-13 (75:25-76:6); *see also* Ex. X, ECF No. 332-24 at 4

(40:15-18).) Plaintiff Casey Dufour acknowledged that his supervisor routinely approved requests for overtime; despite that, he intentionally requested less overtime than he worked because he did not believe a higher request would be approved. (Ex. AA, ECF No. 332-27 at 26-28 (152:5-154:11).) At the same time, at least once, Dufour received his manager's approval to work overtime but then did not record those overtime hours. (*Id.* at 29 (155:1-159:5).) In an e-mail to his manager, Dufour explained that he did not end up needing overtime on that occasion. (*Id.*)

Plaintiffs were paid for all the time that they reported to KeyPoint. (*E.g.,* Ex. II, ECF No. 332-35 at 19 (109:20-24); Ex. AA, ECF No. 332-27 at 16 (103:5-12).) Plaintiffs agree that reported overtime is paid whether or not preapproved. (Ex. H, ECF No. 332-8 at 10-11 (60:18-61:8); Ex. GG, ECF No. 332-33 at 3 (35:19-22), 11 (45:1-8); Ex. K, ECF No. 332-11 at 8 (59:2-9); Ex. X, ECF No. 332-24 at 15 (88:5-15), 19 (127:14-24); Ex. KK, ECF No. 332-37 at 3-4 (23:15-24:2); Ex. OO, ECF No. 332-41 at 11 (86:4-17); Ex. NN, ECF No. 332-40 at 9 (66:8-22); Ex. MM, ECF No. 332-39 at 10-11 (66:14-67:5).) Indeed, Plaintiff Anas testified that, on one occasion, she worked overtime but recorded it as regular time. Anas's supervisor pointed out the error and asked Anas to correct her timesheet to reflect more than six hours of overtime. (Ex. HH, ECF No. 332-34 at 21-22 (118:17-119:9); Ex. QQ, ECF No. 332-43 at 2.) Plaintiff Daryl Bernard similarly testified to an occasion on which KeyPoint identified an error in his timesheet (five overtime hours reported as regular hours), and KeyPoint's payroll department corrected it to ensure he was paid accurately. (Ex. KK, ECF No. 332-37 at 7-9 (50:19-52:7).)[13]

---

[13] Notably, Plaintiffs identify no evidence that FMs altered their timesheets. (*E.g.*, Ex. L, ECF No. 332-12 at 20 (102:23-25) (testifying to no knowledge of improper timesheet alterations).) The only testimony on this topic shows that timesheets were modified by the payroll department or Plaintiffs themselves to their *benefit*, not to remove recorded overtime.

E. **Plaintiffs Fail to Establish an Alleged Unlawful Practice or Policy of Not Recording All Overtime Worked.**

Plaintiffs' myriad rationales for failing to accurately report their time preclude a determination that KeyPoint had a uniform policy or practice to prohibit accurate time reporting. Instead, Plaintiffs underreported their hours for a range of different reasons, including because they subjectively felt "pressure" to achieve performance metrics, to avoid increased expectations, to secure their own jobs, or to obtain advancement or bonuses. Plaintiffs fail to establish a single, uniform, nationwide, unlawful policy or practice.

For example, Plaintiff Crystal Lugo testified that, during training, KeyPoint encouraged her to complete her work within 40 hours, and she underreported hours on that basis even though her manager never told her to underreport her hours, and she never told her manager she was working off-the-clock. (Ex. SS, ECF No. 332-45 at 3 (52:9-13), 4 (101:9-19), 5 (108:5-8), 6 (110:2-7).) Plaintiff Angela Hudkins testified that she did not report all her hours because she felt "pressured" to meet performance metrics. (Ex. II, ECF No. 332-35 at 12-14 (85:14-87:4).) Hudkins testified she felt as though she could not request overtime because, in connection with her request, her supervisor asked whether overtime would enable her to transmit more source units. (*Id.*) Hudkins admitted, however, that her manager never asked her to work off-the-clock. (*Id.*) Plaintiff Wahrer felt that she might get fired if she accurately reported her time.  In the context of admitting that she violated KeyPoint's policies during her employment, she testified that, "I did what I did because I had to maintain my employment and I felt that I had no other choice but to get it done or lose my job." (Ex. JJ, ECF No. 332-36 at 6-7 (45:20-46:15).) At least one Plaintiff underreported her hours because she felt that reporting over eight hours per day would increase her production requirement. (Ex. NN, ECF No. 332-40 at 10 (79:10-13).)

Other Plaintiffs claim to have underreported their hours to appear successful to KeyPoint. Plaintiff Carman, as one example, claims he underreported hours to secure a bigger bonus. (Ex. OO, ECF No. 332-41 at 13-14 (105:20-106:3).) He also claims he underreported his hours in some weeks because he felt that he did not produce enough source units to justify his hours. (*Id.* at 12 (99:1-14).) Plaintiff Ruenette Evans testified that she failed to report all of her hours in order to appear as if she met the productivity and efficiency requirements of her position. (Ex. X, ECF No. 332-24 at 13 (75:5-9).) Named Plaintiff Ponce testified she failed to follow KeyPoint's timekeeping policy and record all of her hours to avoid an impact on her production and efficiency. (Ex. L, ECF No. 332-12 at 18 (79:7-13).) Plaintiff Anas first began working off-the-clock, not at her supervisor's direction, but to "be a good employee." (Ex. HH, ECF No. 332-34 at 15 (72:2-6).) Plaintiff Daryl Bernard testified that underreporting his hours was his "solution" to feeling too busy. (Ex. KK, ECF No. 332-37 at 12 (68:6-14).) Plaintiff Casey Dufour did not report all hours because he thought he would get in trouble. (Ex. AA, ECF No. 332-27 at 23-25 (142:24-144:14).)

**F.      Plaintiffs Admit that FMs Did Not Prohibit Accurate Timekeeping.**

Plaintiffs testified consistently that no one at KeyPoint instructed them to underreport hours or to work off-the-clock. Plaintiff Daryl Bernard admitted that no one told him to underreport his hours. (Ex. KK, ECF No. 332-37 at 13 (108:20-22).) Named Plaintiff Ponce admitted in her deposition that neither her supervisor nor any other KeyPoint employee told her to work off-the-clock or underreport her hours. (Ex. L, ECF No. 332-12 at 13 (58:16-22).) The same is true for many other Plaintiffs. (*E.g.*, Ex. JJ, ECF No. 332-36 at 12 (105:21-24); Ex. NN, ECF No. 332-40 at 3-4 (49:23-50:1); Ex. AA, ECF No. 332-27 at 20-21 (126:25-127:5); Ex. GG, ECF No. 332-33 at 14 (50:1-12), 24-25 (84:24-85:6); Ex. K, ECF No. 332-11 at 15 (83:20-22); Ex. II, ECF No.

332-35 at 8 (76:16-18), 13-14 (86:24-87:4), 18 (104:2-6); Ex. X, ECF No. 332-24 at 12 (69:7-18), 19-20 (127:14-128:6); Ex. LL, ECF No. 332-38 at 6 (78:23-25) (Q: "No one at KeyPoint ever told you to work without reporting your time, correct?" A: "No, they did not say that, no.").)  No Plaintiffs reported that they were instructed **not** to report their time.

### G.    Plaintiffs Did Not Complain About Unpaid Overtime Hours.

Plaintiffs generally did not complain about or report the "off-the-clock" work they allege to anyone at KeyPoint. (Ex. H, ECF No. 332-8 at 3-4 (42:17-43:16), 22 (126:2-7); Ex. GG, ECF No. 332-33 at 26-27 (87:21-88:2), 28 (93:1-8), 29-30 (95:18-96:11); Ex. HH,  ECF No. 332-34 at 16 (79:15-19); Ex. MM, ECF No. 332-39 at 7 (50:7-10), 8 (52:11-15), 12 (71:6-12); Ex. LL,  ECF No. 332-38 at 5 (76:5-15); Ex. ECF No. 332-40 at 6-7 (54:22-55:2), 8 (57:7-10); Ex. AA, ECF No. 332-27 at 10-11 (94:24-95:4), 34-35 (161:21-162:1).) In fact, some Plaintiffs acknowledged that, by *not* telling their FMs that they worked off-the-clock, they effectively concealed their unreported overtime. (*E.g.*, Ex. GG, ECF No. 332-33 at 23 (78:7-21).) Plaintiff Marcia Eames, for example, admitted that she never complained to any FM or anyone in Human Resources that she was not paid for all hours worked. (Ex. K, ECF No. 332-11 at 17 (86:12-16).) Named Plaintiff Ponce likewise testified that she never told her FM that she was not accurately reporting her hours. (Ex. L, ECF No. 332-12 at 14 (60:19-22), 15 (62:5-12), 19 (99:15-22), 21-22 (103:18-104:1); *see also* Ex. OO, ECF No. 332-41 at 5 (38:11-22); Ex. II, ECF No. 332-35 at 7 (75:10-22), 15 (90:8-20); Ex. JJ, ECF No. 332-36 at 11 (104:16-22).) Plaintiff Natalie Mendez complained to her manager about a **lack** of work, but she never reported that she worked off-the-clock. (Ex. NN, ECF No. 332-40 at 5 (52:15-19).)

The crux of Plaintiffs' case is that KeyPoint "should have known" of their off-the-clock

work. (*E.g.*, Ex. KK, ECF No. 332-37 at 14-15 (109:17-110:4).) Some Plaintiffs claim to have told

their managers that they had too much work; on that basis, they argue that by approving timesheets,

their managers should have known they were working off-the-clock. (*E.g.*, Ex. HH, ECF No. 332-

34 at 4-5 (40:18-41:18).) However, when pressed, Plaintiffs engaged in exercises in clairvoyance,

asserting without support that their FMs knew they falsified their timesheets by underreporting

hours. (*E.g.*, Ex. KK, ECF No. 332-37 at 14-15 (109:17-110:4); Ex. TT, ECF No. 332-46 at 3-5

(87:10-89:9); Ex. NN, ECF No. 332-40 at 4 (50:2-25); Ex. UU, ECF No. 332-47 at 4-8 (140:20-

144:19); Ex. OO, ECF No. 332-41 at 6-10 (63:22-67:24; Ex. 27, ECF No. 332-27 at 3-5 (70:25-

72:15); Ex. H, ECF No. 332-8 at 21-24 (125:9-128:17).). As one example, Plaintiff Marcia Eames

claims that her FM "had to know" she worked off-the-clock, but concedes that no one ever directed

her to work off-the-clock and that she never disclosed off-the-clock work to a manager or Human

Resources. (Ex. K, ECF No. 332-11 at 11-12 (74:12-75:10), 15 (83:20-22), 17 (86:12-16).) Named

Plaintiff Ponce testified similarly—although she holds a vague belief that her claims are typical of

others because "everybody was given too much work," she admitted that she never raised the issue

with KeyPoint and that other FIs may have met KeyPoint's productivity expectations and reported

all of their time. (Ex. L, ECF No. 332-12 at 22 (104:2-6); *see also* Ex. UU, ECF No. 332-47 at 3

(83:2-18) ("I believe that the job can probably be done in 40 hours a week . . . .").) When asked

how KeyPoint would know about hours that she did not record, Ponce testified, "**I don't know**."

(Ex. L, ECF No. 332-12 at 23-24 (105:20-106:9) (emphasis added).) Other Plaintiffs claimed that

KeyPoint should have known about unreported hours because they sent e-mails or made calls

outside of normal business hours. (*E.g.*, Ex. TT, ECF No. 332-46 at 3-4 (87:20-88:11).) However,

the time at which FIs perform any given task is not indicative of off-the-clock work, particularly

given that FIs are all remote employees who set their own schedules. (Ex. B, ECF No. 332-2 at 2; Ex. C, ECF No. 332-3 at 2.)  Notably, Plaintiff Sean Whitaker testified that it was particularly important for him to accurately report his hours because as a remote employee he did not work in an office where KeyPoint would be aware of his hours. (Ex. I, ECF No. 332-9 at 7 (42:4-12).)

### H.    No Representative Proof of Alleged Hours Worked or Damages Exists.

This is not a case in which Plaintiffs seek similar damages or claim that they were not paid for a similar amount of work. Plaintiffs' speculative estimates vary widely (and in a number of cases have "evolved" during discovery) with respect to the number of unreported hours – and thus damages sought – from zero hours to as many as 32 hours per week.  As examples, Plaintiff Rapert testified that he is not seeking **any** overtime compensation in this lawsuit. (Ex. LL, ECF No. 332-38 at 4 (62:6-8).) Plaintiff Levasseuer-Hawkins claimed an average of 16 unreported hours per week. (Ex. H, ECF No. 332-8 at 16-17 (83:14-84:4).) Plaintiff Evans claimed an average of 20-32 unreported hours per week, including unreported hours in addition to those for which KeyPoint already paid her when she was fired for working off-the-clock. (Ex. X, ECF No. 332-24 at 6-7 (52:19-53:11).) Other Plaintiffs' estimates are similarly varied.  Additionally, Plaintiffs are incapable of defining any particular time in which they worked overtime or underreported their hours. Plaintiff Norton, for example, claimed an average of 15-20 overtime hours per week. (Ex. MM, ECF No. 332-39 at 14-15 (89:14-90:5).) But at deposition admitted that she likely did not work this average every week, and any reported overtime was paid and should be subtracted from this average. (Ex. MM, ECF No. 332-39 at 15 (90:6-9), 17 (110:16-20), 18-20 (114:15-116:21); *see also*  Ex. I, ECF No. 332-9 at 14-15 (98:22-99:2) (testifying that he does not recall his specific hours).)

Records of the hours claimed by Plaintiffs do not exist, let alone accurate records. (Ex. H, ECF No. 332-8 at 13-14 (68:14-69:10), 18 (95:2-16); Ex. GG, ECF No. 332-33 at 26 (87:3-15); Ex. K, ECF No. 332-11 at 10 (73:17-21), 14 (78:13-17); Ex. MM, ECF No. 332-39 at 21 (123:1-10); Ex. KK, ECF No. 332-37 at 11 (57:8-22); Ex. I, ECF No. 332-9 at 13 (95:8-21); Ex. NN, ECF No. 332-40 at 11 (93:3-21).) Plaintiff Marcia Eames testified that she does not recall working overtime on any specific day or the number of overtime hours she allegedly worked on any specific occasion. (Ex. K, ECF No. 332-11 at 18 (90:15-20), 19-20 (92:23-93:8).) Plaintiff Eames's claim is instead based on her purported "typical routine," (*id.*), a measure that is inherently speculative *and individualized*.  Plaintiff Evans likewise testified that her "estimate" of average unreported hours (between 20 and 32 overtime hours per week) is based solely on her memory, and she has no evidence to better define the quantity of hours for which she now seeks compensation. (Ex. X, ECF No. 332-24 at 8 (54:1-9).) At least six Plaintiffs admitted that they created but have since destroyed records that could have helped determine the hours they claim to have worked. (Ex. H, ECF No. 332-8 at 14 (69:3-12), 19-20 (123:17-124:3); Ex. K, ECF No. 332-11 at 4 (32:1-17); Ex. L, ECF No. 332-12 at 8 (44:18-21), 17-18 (78:21-79:6); Ex. II, ECF No. 332-35 at 16 (92:7-16); Ex. JJ, ECF No. 332-36 at 9-10 (48:1-49:11); Ex. AA, ECF No. 332-27 at 19 (122:9-17).)

In the absence of records, and armed only with their own speculation, Plaintiffs concede that the precise number of unreported hours cannot be calculated. (*E.g.*, Ex. GG, ECF No. 332-33 at 31 (101:8-19); Ex. L, ECF No. 332-12 at 24-25 (106:12-107:4); Ex. JJ, ECF No. 332-36 at 8 (47:23-25); Ex. X, ECF No. 332-24 at 8 (54:1-9).) Nonetheless, Plaintiffs' counsel has attempted (in vain) to construct a calculation of damages based on Plaintiffs' interrogatory answers, or what Plaintiffs' counsel refers to as Plaintiffs' "good-faith estimate." Alexander Wise, a "Data Analytics

Manager" employed by Plaintiffs' counsel, created a spreadsheet attributing a dollar amount in damages to each Plaintiff. (Ex. VV, ECF No. 332-48 at 3-4 (8:24-9:3).) He did not perform any due diligence himself to determine if Plaintiffs' estimates are accurate. (*Id.* at 5-7 (16:11-18:16).) He did not speak with any Plaintiff. (*Id.*) He was not aware that Plaintiffs changed their estimates during their depositions. (*Id.*) Wise acknowledged that his model would be inaccurate if Plaintiffs' estimates were inaccurate.[14] (ECF No. 332-48 at 15-16 (27:19-28:4).) Because Plaintiffs' estimates are inherently speculative, Plaintiffs' counsel's attempt to calculate damages on that basis naturally failed.

## V.    ANALYSIS

The Fair Labor Standards Act permits a collective action of individuals "similarly situated." 29 U.S.C. § 216(b). At the decertification stage, the Court applies a much stricter "similarly situated" standard than applied at the conditional certification stage. In determining whether plaintiffs are similarly situated, a court reviews several factors, including (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Thiessen,* 267 F.3d at 1103. Plaintiffs bear the burden of establishing that they are similarly situated and that collective treatment is appropriate. *Coldwell v. Ritecorp Envtl. Prop. Sols.*, 2017 U.S. Dist. LEXIS 214646 (D. Colo. 2017). Here, Plaintiffs cannot meet that burden.

"Logically, the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953

---

[14] After a number of Plaintiffs were deposed and testified to the inaccuracy of the damages calculations reflected in their interrogatories, Plaintiffs provided a new spreadsheet with updated calculations to conform to the deposition testimony. The need to revise their calculations after deposition testimony only confirms that individualized damages inquiries are required of each Plaintiff.

(11th Cir. 2007). The similarities necessary to maintain a collective action under § 216(b) must extend "beyond the mere facts of job duties and pay provisions." *White v. Osmose, Inc.*, 204 F.Supp.2d 1309, 1314 (M.D. Ala. 2002). Otherwise, "it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Id.* The potential for abuse is significant when collective actions involve a high number of individuals spread across many locations and managed by many different supervisors. *E.g.*, *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 942 (D. Minn. 2009) (denying conditional certification for lack of direct evidence of common policy nationwide and refusing to infer the existence of the same). Accordingly, courts require more direct and compelling evidence of commonality for such cases to proceed as collective actions. *Id.*

No such evidence exists in this case, and decertification is warranted. Plaintiffs vary widely with respect to their geographic locations, supervisory chains, the reasons they allegedly worked off-the-clock, and the amount of overtime or unreported hours for which they seek compensation in this lawsuit. Plaintiffs' testimony is also strikingly disparate on the existence of a single, uniform, nationwide policy or practice that impacted all of them. Plaintiffs fall far short of establishing even an inference that such a policy or practice existed, and the record demonstrates that KeyPoint had no reason to know that Plaintiffs allegedly chose to work off-the-clock. Finally, representative proof of damages is simply not feasible as Plaintiffs' damages are incapable of calculation beyond a speculative level. Plaintiffs attempted to "estimate" their unreported hours in written discovery, but these estimates fell apart under scrutiny in subsequent depositions, showing the need for a mini-trial regarding each Plaintiff's damages. These factors warrant decertification.

**A.**    **Plaintiffs' Factual and Employment Settings Varied Widely, Particularly as to Alleged Unreported Hours or Unpaid Overtime.**

Plaintiffs' factual and employment settings vary widely such that their claims are unfit for collective adjudication. *Thiessen*, 267 F.3d at 1103; *see also Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013) (affirming decertification of FLSA collective where each collective member claimed a different number of unreported hours); *Avendano v. Averus, Inc.*, 2015 WL 1529354, at *6 (D. Colo. Mar. 31, 2014). For example, this Court in *Avendano* denied a motion to conditionally certify a nationwide class of employees, and limited certification to only those who reported to the same supervisor as the plaintiff, because plaintiff failed to "substantially allege" that any employees who did not report to the same supervisor were also victims of the same alleged single policy. *Id. West v. Verizon Commc'ns, Inc.*, No. 8:08-CV-1325-T-33MAP, 2009 WL 2999181, at *3 (M.D. Fla. July 29, 2009), *report and recommendation adopted in part*, No. 8:08-CV-1325-T-33MAP, 2009 WL 2957963 (M.D. Fla. Sept. 10, 2009) is instructive on this point. In *West*, the Court denied conditional certification in an "off-the-clock" case, in part because each plaintiff had a flexible schedule, worked different hours, and sought different amounts of overtime that would require individualized inquiries. *Id*. at *3. The Court found that "the need for individualized inquiries would contravene the basic theory of judicial economy upon which the certification of collective actions is based." *Id.* On this basis, the plaintiffs in *West* failed to meet even the far more lenient conditional certification standard.

Here, KeyPoint employed Plaintiffs in more than 32 different states, working fully remotely. (Ex. F, ECF No. 332-6 at 2 ¶ 3.) While employed, Plaintiffs were supervised by 111 different FMs. (*Id.* 2 ¶ 4.) Plaintiffs vary widely regarding the number of hours allegedly worked off-the-clock —one Plaintiff (Danny Rapert) seeks no overtime compensation (Ex. LL, ECF No.

332-38 at 4 (62:6-8),) while others contend that they worked (but did not report) varying hours up to more than 30 hours per week. (*E.g.*, Ex. X, ECF No. 332-24 at 6-7 (52:19-53:11).) Plaintiffs' employment experiences further vary as discussed below, demonstrating that the first *Thiessen* factor supports decertification.

### 1.    No Uniform Policy or Practice of Not Recording Overtime Hours Exists

It is indisputable that Plaintiffs bear the burden of demonstrating not only the existence of a single decision, policy or plan that violates the FLSA, but that it applies nationwide. *See, e.g.*, *Avendano, Inc.*, 2015 WL 1529354, at *6; *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (mere allegation of performance demands does not sufficiently allege a common policy requiring employees to work off-the-clock; thus, conditional certification denied). Plaintiffs failed to carry that burden.

The question is not whether Plaintiffs are similarly situated based on the work performed, but whether they are similarly situated because they suffered the same harm due to the same policy. Plaintiffs cannot rely on isolated testimony regarding one or two employees' experiences to meet their burden.  Courts have denied even *conditional* certification on that basis. *See Tracy v. Dean Witter Reynolds, Inc.*, 185 F.R.D. 303, 311 (D. Colo. 1998) (although some managers subjected some individuals to unpaid overtime, "that fact alone does not lead [one] to conclude that there must be some unlawful national policy out there somewhere"); *Braun v. Superior Indus. Int'l, Inc.*, No. 09-2560-JWL, 2010 WL 3879498, at *6 (D. Kan. Sept. 28, 2010) (denying nationwide certification because alleged policy was implemented by a handful of "rogue" supervisors).

Plaintiffs consistently testified that no KeyPoint manager instructed them to underreport their hours or to work hours without reporting the time. (See Section IV. F, *supra*.) To the extent

Plaintiffs claim an unlawful policy existed, Plaintiffs have offered a shifting variety of explanations for this belief that in the main ***stem from their individual employment experiences***. One Plaintiff felt the need to underreport her hours because, she claims, she was encouraged to complete her work within 40 hours during training. (Ex. SS, ECF No. 332-45 at 4 (101:9-19), 5 (108:5-8).) One Plaintiff claimed that she felt "pressured" to underreport her hours because, in connection with requests for overtime, her supervisor asked whether overtime would enable her to transmit more source units. (Ex. II, ECF No. 332-35 at 12-14 (85:14-87:4).) An FM's interest in knowing what an FI will do while working overtime does not equate to a policy requiring off-the-clock work, and the same Plaintiff admitted that her supervisor never asked her to work off-the-clock. (*Id.*) Other Plaintiffs underreported their hours to appear more productive (*e.g.*, Ex. X, ECF No. 332-24 at 13 (75:5-9)), to "be a good employee," (Ex. HH, ECF No. 332-34 at 15 (72:2-6)), or to secure a bigger bonus. (Ex. OO, ECF No. 332-41 at 13-14 (105:20-106:3); *see also* Section IV. E, *supra*.) These anecdotal beliefs are highly individualized and do not support Plaintiffs' allegation that KeyPoint prohibited or discouraged accurate time reporting in a single, uniform, nationwide policy. This is particularly true given the significant differences in Plaintiffs' geographic locations and supervisory chains. *See Tracy*, 185 F.R.D. at 311. To the contrary, KeyPoint's written policies and instructions foreclose Plaintiffs' theory.[15]

## 2. Plaintiffs Are Inconsistent as to KeyPoint's Awareness of Underreported Hours or Unpaid Overtime.

To proceed as a collective, Plaintiffs must also show that KeyPoint knew or

---

[15] To the extent Plaintiffs attempt to argue that KeyPoint mandated "productive overtime" (*i.e.*, permitting overtime only when it resulted in transmission of additional source units), the record is clear that no such policy existed. (*See* Ex. XX, ECF No. 332-50 at 3-4 (100:25-101:2), 5-6 (104:22-105:2) ("[W]e do not have a productive overtime policy.").)

should have known they were working overtime without compensation pursuant to the same nationwide policy. *E.g.*, *Renteria-Camacho,* 2017 WL 4619354, at *7 (citing *Whitaker v. Pac. Enters. Oil Co. (USA)*, 956 F.2d 1170 (10th Cir. 1992)).

KeyPoint had no reason to believe that FIs worked off-the-clock, falsified their timesheets, or underreported their hours.  Plaintiffs did not complain to their supervisors or Human Resources about the "off-the-clock" work they allege. (Ex. H, ECF No. 332-8 at 3-4 (42:17-43:16), 22 (126:2-7); Ex. GG, ECF No. 332-33 at 26-27 (87:21-88:2), 28 (93:1-8), 29-30 (95:18-96:11); Ex. HH, ECF No. 332-34 at 16 (79:15-19); Ex. MM, ECF No. 332-39 at 7 (50:7-10), 8 (52:11-15), 12 (71:6-12); Ex. LL, ECF No. 332-38 at 5 (76:5-15); Ex. NN, ECF No. 332-40 at 6-7 (54:22-55:2), 8 (57:7-10); Ex. AA, ECF No. 332-27 at 10-11 (94:24-95:4), 34-35 (161:21-162:1).) In fact, some Plaintiffs expressly disclaimed "off-the-clock" work to their FMs. (*E.g.*, Ex. GG, ECF No. 332-33 at 23 (78:16-23); *see also* Section II. G, *supra*.)

Several Plaintiffs testified to believing – subjectively – that KeyPoint "should have known" of their off-the-clock work. (*E.g.*, Ex. KK, ECF No. 332-37 at 14-15 (109:17-110:4).) However, when pressed, Plaintiffs identified no bases – other than their subjective speculation – for their FMs to know they falsified their timesheets to underreport their hours. (*See* Section IV. G, *supra*.) The record establishes that KeyPoint had no reason to know that Plaintiffs allegedly worked off-the-clock.

### B.    Individual Damages Claims and Analyses Preclude Collective Treatment.

Decertification is appropriate where individualized issues of proof or defenses inhibit the efficiency of proceeding on a collective basis. *E.g.*, *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1009 (D. Kan. 2018) (decertifying collective in which "Defendants' defenses as to each

Plaintiff [were] ... highly individualized" such that Defendants would "be required to call hundreds of Plaintiffs to testify as to their claims...."); *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 934 (E.D. Ark. 2012) (collective treatment is inappropriate where "individualized inquiries would[] have to be conducted to determine whether any of the class members worked off-the-clock during any given week, and if so, how many hours were worked"); *Saleen,* 649 F. Supp. 2d at 942 (affirming magistrate's denial of collective certification where plaintiffs gave "very different explanations for being shortchanged").

The record makes clear that individualized proof of Plaintiffs' alleged unreported hours is required, making it impossible to resolve Plaintiffs' claims collectively. Plaintiffs allege that they worked varying amounts of overtime; that the overtime was incurred at varying times; and, tellingly, that they cannot recall when or for what reason that overtime was performed. For the 25 Plaintiffs who were deposed, these numbers frequently changed under cross-examination; the same can be expected of the other 189 Plaintiffs. Plaintiffs do not seek compensation for the same or even similar time periods, and Plaintiffs' damages are not susceptible to mechanical calculation. (*E.g.*, Ex. LL, ECF No. 332-38 at 4 (62:6-14) ("I could care less if they give me a dollar."); Ex. H, ECF No. 332-8 at 16-17 (83:14-84:4) (claiming 16 hours per week); Ex. X, ECF No. 332-24 at 6-7 (52:19-53:11) (claiming 32 hours per week).) "Representative proof" of damages does not exist.

Additionally, some Plaintiffs openly acknowledge that their decisions to underreport their hours stemmed more from their desires to appear to meet KeyPoint's productivity expectations rather than any unlawful KeyPoint policy.[16] No "representative proof" can capture Plaintiffs who

---

[16] Plaintiff Ruenette Evans, for example, failed to report all her hours to appear as if she met the productivity and efficiency requirements. (Ex. X, ECF. No. 332-24 at 13 (75:5-9).) Plaintiff Evans misrepresented her hours to avoid termination. (*Id.* at 18 (121:16-23), 21-22 (130:24-131:2); see also Ex. L, ECF. No. 332-12 at 18 (79:7-13); Ex. JJ, ECF. No. 332-36 at 7 (46:7-15).)

underreported their hours for their own benefit.

Plaintiffs also uniformly testify that no accurate records exist of the time that they claim to have worked but did not report (*E.g.*, Ex. H, ECF. No. 332-8 at 13-14 (68:14-69:10), 18 (95:2-16); Ex. GG, ECF. No. 332-33 at 26 (87:3-15); Ex. K, ECF. No. 332-11 at 10 (73:17-21), 14 (78:13-17); Ex. MM, ECF. No. 332-39 at 21 (123:1-10); Ex. KK, ECF. No. 332-37 at 11 (57:8-22); Ex. I, ECF. No. 332-9 at 13 (95:8-21); Ex. NN, ECF. No. 332-40 at 11 (93:3-21)), and many Plaintiffs claim to have created time records that they have since destroyed. (Ex. H, ECF. No. 332-8 at 14 (69:3-12), 19-20 (123:17-124:3); Ex. K, ECF. No. 332-11 at 4 (32:1-17); Ex. L, ECF. No. 332-12 at 8 (44:18-21), 17-18 (78:21-79:6); Ex. II, ECF. No. 332-35 at 16 (92:7-16); Ex. JJ, ECF. No. 332-36 at 9-10 (48:1-49:11); Ex. AA, ECF. No. 332-27 at 19 (122:9-17).) Under the circumstances, Plaintiffs are left to speculate as to the number of hours that they claim to have worked but not reported. This evidence must be subject to adverse examination by KeyPoint, requiring 214 individual evidentiary hearings or "mini trials."

Plaintiffs' attempts at representative proof only confirm that such proof is inherently speculative and unreliable. As noted above, Plaintiffs disclosed a spreadsheet that purports to attribute a dollar amount of damages to each Plaintiff. Data Analytics Manager Alexander Wise, an employee of Plaintiffs' counsel, created the spreadsheet based on estimates of Plaintiffs' hours provided by Plaintiffs' counsel. Specifically, Wise analyzed the "one data point" per Plaintiff that he received against their time and pay records, applying assumptions regarding when Plaintiffs may or may not have worked hours that they did not report. (*See* Ex. VV, ECF. No. 332-48 at 9-14 (20:4-25:25).) For example, Wise attempted to adjust for times during which Plaintiffs took vacation or reported overtime. (*Id.* at 8-10 (19:15-21:21).) However, Wise did not adjust for

periods of time when Plaintiffs went through KeyPoint training at the start of their employment. (*Id.* at 11 (22:5-8).) Several Plaintiffs admitted that they did not work overtime during training or were fully paid for such time. (*E.g.*, Ex. WW, ECF. No. 332-49 at 3 (35:3-9), 4-5 (76:21-77:7); Ex. AA, ECF. No. 332-27 at 22 (139:2-18); Ex. X, ECF. No. 332-24 at 9 (59:17-25).) Wise also did not adjust his calculations for time periods in which Plaintiffs held roles other than a FI. (Ex. VV, ECF. No. 332-48 at 11 (22:5-8).)

Wise's analysis is the equivalent of an expert analysis performed by a lay witness with no personal knowledge of any of the facts.[17] Wise acknowledged that his model is inaccurate if Plaintiffs' estimates are inaccurate (*Id.* at 15-16 (27:19-28:4)), and discovery has established just that. (Ex. JJ, ECF. No. 332-36 at 13 (106:10-19); Ex. AA, ECF. No. 332-27 at 18 (116:11-18); *compare* Ex. LL, ECF. No. 332-38 at 4 (62:4-8) *with* Ex. YY, ECF. No. 332-51 at 3-4, Rapert's Ans. to Def.'s Interrog. 2.) The inaccuracies in Plaintiffs' attempted formulaic approach to damages underscores that Plaintiffs' damages are not capable of calculation beyond a speculative level and certainly not to a "just" and "reasonable" level. *Anderson v. Mt. Clemons Pottery Co.,* 328 U.S. 680, 687 (1946).  Here, individualized damages inquiries are necessary, making the claims unfit for collective adjudication.

Several courts have decertified collective actions on similar facts. In *Espenscheid v. Directsat USA, LLC*, *et al.*, the Seventh Circuit affirmed the district court's decision to decertify FLSA collectives concerning unpaid overtime. 705 F.3d. at 771. The Court determined that variances in the number of unpaid overtime hours claimed by Plaintiffs rendered the claims

---

[17] Plaintiffs did not and have not disclosed Wise as an expert witness nor complied with the disclosure requirements pertaining to expert witnesses. On this basis alone, the Court should reject Wise's analysis. Fed. R. Civ. P. 37(c).

infeasible to try together: "For it's not as if each technician worked from 8 a.m. to 5 p.m. and was forbidden to take a lunch break and so worked a 45–hour week . . . but was paid no overtime. Then each technician's damages could be computed effortlessly, mechanically, from the number of days he worked each week and his hourly wage." *Id.* at 773.

The Court rejected the plaintiffs' proposal to offer "representative" proof at trial. *Id.* at 774. Even if plaintiffs were sampled at random, the Court observed that "this would not enable the damages of any members of the class other than the [random sample] to be calculated." *Id.* The Court further noted that "[t]o extrapolate from the experience of the [random sample] to that of the [collective] would require that all [all collective members] have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage . . . No one thinks there was such uniformity." *Id.* Instead, the result of such an approach would provide windfalls to some plaintiffs while undercompensating others. *Id.* This concern applies with particular force where a worker underreported hours "not under pressure by [the employer] but because he wanted to impress the company with his efficiency in the hope of obtaining a promotion or maybe a better job elsewhere—or just to avoid being laid off." *Id.* Representative proof cannot hope to separate "benign underreporting" from an unlawful requirement. *Id.*

Representative proof is infeasible where plaintiffs "have no records of the amount of time they worked but didn't report on their time sheets." *Id.* at 774-75 (technicians are "not like lawyers, who record every bit of work they do for a client, in 6-minute segments"). In fact, *Espenscheid* court noted that while the plaintiffs claimed that their records were incomplete because the employer told them not to report all their time, that did "not excuse them from having to establish the amount of the unreported time," and thus could not adjudicate their FLSA claims collectively.

(*Id.*) The same result should issue in this case.

### IV.   CONCLUSION

Based on the foregoing, the Court should grant KeyPoint's Motion, decertify the FLSA collective previously certified in this lawsuit, and dismiss the opt-in Plaintiffs.

Dated:  December 30, 2021

By:   *s/Margaret Parnell Hogan*
Margaret Parnell Hogan
Jennifer S. Harpole
Michelle L. Gomez
Thomas W. Carroll
Danielle VanKatwyk
LITTLER MENDELSON, P.C.
1900 16th Street, Suite 800
Denver, CO  80202
Telephone:  303.629.6200
Facsimile:  303.629.0200
Email:  mphogan@littler.com
          jharpole@littler.com
          mgomez@littler.com
          tcarroll@littler.com
          dvankatwyk@littler.com

Jacqueline E. Kalk
Corey Christensen
LITTLER MENDELSON, P.C.
80 South 8th Street, Suite 1300
Minneapolis, MN  55402
Tele:  (612) 313-7645
Fax:  (612) 677-3139
Email:  JKalk@littler.com

Matthew J. Ruza
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, IL 60654
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: mruza@littler.com

Steven Kaplan
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, NW Suite 400
Washington, DC 20006
Telephone: 202.842.3400
Facsimile: 202.842.0011
Email: skaplan@littler.com

ATTORNEYS FOR DEFENDANT KEYPOINT
GOVERNMENT SOLUTIONS INC

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December, 2021, a true and correct copy of the

foregoing **DEFENDANT KEYPOINT GOVERNMENT SOLUTIONS, INC.'S AMENDED**

**MOTION FOR DECERTIFICATION** was filed and served via CM/ECF on the following:

Rachhana T. Srey
Caroline Elizabeth Bressman
H. Clara Coleman
Reena I. Desai
NICHOLS KASTER, PLLP
4600 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
srey@nka.com
cbressman@nka.com
ccolemanb@nka.com
rdesai@nka.com

Daniel S. Brome
Matthew Helland
NICHOLS KASTER, PLLP
234 Montgomery Street, Suite 810
San Francisco, CA 94104
dbrome@nka.com

Benjamin L. Davis, III
George E. Swegman
Kelly A. Burgy
THE LAW OFFICES OF PETER T. NICHOLL
36 South Charles Street, Suite 1700
Baltimore, MD  21201
bdavis@nicholllaw.com
gswegman@nicholllaw.com
kaburgy@nichollaw.com

ATTORNEYS FOR PLAINTIFF AND THE
PUTATIVE FLSA COLLECTIVE CLASS

*s/Valerie Gremillion*
Valerie Gremillion

4866-8798-3880.1 / 097550-1001