## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:18-cv-00550-WJM-NRN

RACHEL BRAYMAN, DANA
McCARTHY, AND ADRIANA PONCE,
Individually and on behalf of all other
Similarly situated individuals,

      Plaintiffs,

v.

KEYPOINT GOVERNMENT SOLUTIONS
INC., a Delaware corporation,

      Defendant.

---

## PLAINTIFFS' AMENDED MOTION FOR FINAL CERTIFICATION OF THE FLSA COLLECTIVE

## INTRODUCTION

> The company sends a message about **working for free (off the clock)** and that you can get terminated for it, but the message they really send out is work for free, because you can't possibly do everything they ask you to do without working for free. . . . I don't understand why someone hasn't sued them yet. **Everyone works for free.**

Ex. 56, Named Plaintiff Adriana Ponce's Exit Interview (emphasis in original), ECF No. 334-24 at 40-41.

Ponce's complaint to Human Resources goes to the heart of this case: KeyPoint knowingly assigned field investigators a heavy workload and subjected them to unrealistic minimum performance expectations, yet commonly denied overtime approval for all of the hours needed to complete the work and routinely ignored their complaints about the workload being too much for a 40-hour workweek.

Ponce was not alone; after extensive written discovery, including interrogatory answers from all Plaintiffs, and depositions of the named and 25 sample Plaintiffs, discovery revealed that Plaintiffs make the same common allegations and are sufficiently similarly situated to proceed collectively at trial. Indeed, the evidence confirms that KeyPoint operated a high stress, pressure cooker, production-obsessed work environment that permeated its workforce, from upper management down to its investigators. KeyPoint required its investigators to perform their background investigative work in the same way and to do so quickly to meet productivity forecasts and cases deadlines. Plaintiffs commonly allege that this productivity-driven work environment resulted in FLSA violations.

The discovery in this case demonstrates that Plaintiffs share similar employment settings, that KeyPoint has no material individualized defenses, and that fairness and procedural concerns,

1

along with the FLSA's broad remedial purpose, justify an FLSA representative trial. For these reasons and those below, this Court should grant Plaintiffs' motion.

## CERTIFICATE OF CONFERRAL

Pursuant to D.C.COLO. LCivR 7.1, Plaintiffs' counsel certifies that they conferred with Defendant's counsel on August 12, 2021 and Defendant opposes this motion.  (Srey Decl. ¶ 6.)

## SUMMARY OF RELEVANT FACTS

### I.   PROCEDURAL BACKGROUND

On March 8, 2018, Plaintiff Rachel Brayman filed this FLSA collective action against KeyPoint Government Solutions, Inc. ("KeyPoint") for overtime pay on her own behalf and other similarly situated individuals. (Compl., ECF No. 1.) On July 9, 2020, Plaintiffs filed their First Amended Complaint, alleging violations of California state wage and hour laws on behalf of a putative Rule 23 class.  (Order, ECF No. 270; 1st Am. Compl., ECF No. 271.)

On April 6, 2018, Plaintiff moved for conditional certification of the FLSA collective action pursuant to 29 U.S.C. § 216(b). (Pls.' Mot., ECF No. 22.) The Court partially granted the motion on November 1, 2018. (Order, ECF No. 69.) On December 16, 2019, the Court defined the collective as:

> All persons who worked as, or who were hired to be, a Field Investigator, Background Investigator, or in other position with similar job duties, for Defendant KeyPoint Government Solutions, Inc. at any time from April 6, 2015 to September 18, 2019.

(Order, ECF No. 217.) Plaintiffs' Counsel distributed an initial notice in September 2019. (Srey Decl. ¶ 2.) This Court later ordered Defendant to provide a supplemental list of investigators. (ECF No. 217.) Plaintiffs' Counsel distributed notice to this supplemental list in January 2020. (Srey Decl. ¶ 3.) Currently, this case consists of 214 Plaintiffs, including Named Plaintiff Brayman and the two Rule 23 California class representatives. (*Id.* ¶ 4.)

The parties subsequently engaged in extensive representative discovery.  KeyPoint took the depositions of Named Plaintiff Brayman, the two Rule 23 California state law class representatives, and 25 opt-in Plaintiffs.  (*Id*. ¶ 5.) Plaintiffs took the depositions of over a dozen corporate representatives and field managers. (*Id*.) The parties also served written discovery.  (*Id*.) Discovery closed on June 30, 2021.  (Order, ECF No. 310.)

## II.   PLAINTIFFS PERFORM THE SAME JOB DUTIES AND ARE SUBJECT TO SIMILAR PERFORMANCE EXPECTATIONS AS INVESTIGATORS.

### A.   All Plaintiffs Share the Same Job Duty of Conducting Investigations.

KeyPoint provided investigative services to federal government agencies, including the Office of Personnel Management ("OPM"). (Ex. 2, Corp. Dep. 16:12-16, ECF No. 335-3 at 8; Ex. 3, Haabestad Depo. 22:8-12, ECF No. 335-4 at 25.)  All Plaintiffs worked for KeyPoint as field investigators ("investigators").  (*See generally* Dkt. for Pl. Consent Forms ¶ 2.) As investigators, Plaintiffs shared the same primary job duty to perform investigative work and are subject to the same job description.  (Ex. 1, Investigator Job Descriptions, pending Court permission to refile corrected exhibit per ECF No. 354; Ex. 2, Corp. Dep. 77:18-78:4, ECF No. 335-3 at 16-17 (stating that there is nothing individualized about the job description); Ex. 3, Pe Dep. 122:9-14, ECF No. 335-4 at 72, Ex. 3, Haabestad Dep. 27:14-22, ECF No. 335-4 at 26 (describing that the same job description is used for all investigator positions, regardless of government contract).)[1]  Plaintiffs performed the common core job tasks consisting of interviewing the subject of an investigation, sources familiar with the subject, pulling records, and producing reports of investigation ("ROI") "within timelines to meet established goals and objectives for timeliness and quality."  (Ex. 1, pending Court permission to refile corrected exhibit per ECF No. 354; *see also* Ex. 2, Corp. Dep.

---

[1]  KeyPoint's Rule 30(b)(6) designee's deposition is attached as Exhibit 2. All other cited depositions are attached as Exhibits 3 (corporate witnesses) and 4 (Plaintiffs) and referenced throughout this brief as "Last Name Dep." along with the relevant page citation.

63:5-18, ECF No. 335-3 at 15 (describing investigators' core job duties).) All investigators' reports were subject to the same quality review conducted by KeyPoint's centralized Review Department, which reviewed the reports against the same federal government's quality standards and sent cases back to investigators as "reworks" for correction.  (Ex. 2, Corp. Dep. 47:2-13, ECF No. 335-3 at 12.) In addition to those core tasks, investigators briefed their cases by reviewing the subject's application and case notes, scheduled interviews or record pulls, traveled to the interview or record site, and manifested their case papers.  (*See* Ex. 1, pending Court permission to refile corrected exhibit per ECF No. 354.)

All new investigators were required to participate in the same New Investigator Training ("NIT") which consists of online, classroom, and on-the-job training.  (*See* Ex. 5, Brayman Offer Letter, ECF No. 335-6 at 3; Ex. 2, Corp. Dep. 22:21-23:25, ECF No. 335-3 at 9-10 (NIT mandatory for new investigators).)

All investigators were assigned to teams across geographic regions and work under the same reporting structure, supervised by a Field Manager ("FM") who in turn was supervised by a Regional Field Director ("RFD"). Company-wide, all FMs and RFDs shared the same job responsibilities. (*See* Ex. 6, Planning & Logistics, ECF No. 335-7 at 3-4; Ex. 7, Field Ops Org. Chart, ECF No. 335-8 at 2; Ex. 8, Regional Field Director Job Description, ECF No. 335-9 at 2; Ex. 9, Field Manager Job Description, ECF No. 335-10 at 2.)

KeyPoint assigned work in the same manner to investigators. KeyPoint's logistics analysts were responsible for assigning investigators' work using company-wide case assignment strategies. (Ex. 3, Egan Dep. 16:16-17:3, ECF No. 335-4 at 14-15.) All investigators were assigned at least 100% of their capacity (based on 40 fieldwork hours) or more.  (*See* Ex. 10, Manual Assignments, ECF No. 334 at 8 ("All Field Investigators should be assigned to 100% capacity of

their 8 week average or minimal MESUP requirement over the next 14 business days."); Ex. 3, Egan Dep. 32:24-33:6, ECF No. 335-4 at 16-17.)

All investigators utilized the same software programs.  For example, each workday, the investigator must electronically check out and back in case materials that they are bringing into the field, or declare that they will not bring case materials into the field that day. (Ex. 3, Pe Dep. 78:3-79:14, ECF No. 335-4 at 70-71; Ex. 3, Jorgenson Dep. 132:1-14, ECF No. 335-4 at 48.) FMs had access to this same system and could see when their investigators check in/out case materials. (Ex. 3, Jorgenson Dep. 132:15-20, ECF No. 335-4 at 48; Ex. 11, Checklist Management Tool, ECF No. 334-1 at 3.)  Investigators also used the same software called "PIPS" to view and transmit their ROIs.  (Ex. 2, Corp. Dep. 43:22-25, ECF No. 335-3 at 11; Ex. 3, Herrity Dep. 78:15-19, ECF No. 335-4 at 34.)

All investigators were required to stay in regular communication with their FMs.  (Ex. 3, Pe Dep. 54:1-16, ECF No. 335-4 at 68 (FMs can manage investigators in the field through remote communication); Ex. 3, Lipp Dep. 22:13-23:12, ECF No. 335-4 at 58-59 (she can successfully manage investigators remotely through her access to electronic systems and with phone calls); *see also* Ex. 11, ECF No. 334-1 at 3 (describing team communications through email or phone calls as a daily responsibility of field managers).) In addition to regular telephone communication, they all used the same email and instant messaging systems for work-related communications. (*See* Ex. 12, KeyPoint IT Systems, ECF No. 334-2 at 5.)

### B.    Investigators Worked the Same Scheduling Patterns.

All investigators worked out of their homes and in the field. (Ex. 2, Corp. Dep. 58:4-6, ECF No. 335-3 at 14.)  Despite working remotely, investigators commonly performed their fieldwork during core business hours and wrote reports and performed other administrative tasks

in the evenings. KeyPoint expected investigators to work Monday through Friday as their core working days. (Ex. 13, ECF No. 334-3 at 3.) KeyPoint trained investigators to be working when subjects and sources are available for interviews and when record venues are open for business. (Ex. 14, ECF No. 334-4 at 4 (advising investigator to work during normal business hours around 8 to 5 p.m. so they can be productive); Ex. 3, Bowen Dep. 87:5-10, ECF No. 335-4 at 8 (testifying that investigators work at least normal business hours to perform fieldwork).) Further, KeyPoint also trained investigators that the best practice was to perform fieldwork between the hours of about 8:00 a.m. and 4:30 p.m. (Ex. 15, Investigator Planning & Execution, ECF No. 334-5 at 2-3 (identifying 8:00 a.m. and 4:30 p.m. five days per week as scheduling best practices); *see also* Ex. 16, OJT Planning Tool, ECF No. 334-6 at 2-3.)

Consistent with KeyPoint's training and as a practical matter, Plaintiffs performed the majority of their interviews and record pulls during regular business hours Monday through Friday. (*See* Ex. 17, Pls.' Irog. Resps. No. 2, ECF No. 335-11 at 5, 11-12, 20, 27, 34, 40-41, 48-49, 55-56, 63, 70, 78, 85-86, 94, 100-01, 109, 115-16, 122-23, 129-30, 138, 146, 153, 159-60, 167, 173-74, 181, 189, 197, 204, 211-12, 219, 226, 234, 240-41, 247-48, 255-56, 264, 270-71, 278, 286, 292-93, 300, 307, 315, 323, 330, 337-38, 345, 351-52, 360, 368, 376, 382-83, 391, 399-400, 405-06, 414, 421, 429, 437, 445, 453, 459-60, 467, 474, 482, 489, 496-97, 503-04, 511, 518, 525-26, 533-34, 541-42, 549-50, 558, 565-66, 572-73, 581, 587-88, 594-95, 601-02, 610, 617-18, 624-25, 632, 640, 648, 655, 662, 669, 675-76, 684-85, 692-93, 700, 708, 714-15, 721-22, 730, 737, 744-45, 753, 761, 768-69, 777, 784, 790-91, 798-99, 806-07, 815-16, 822, 830, 837-38, 846, 854-55, 860-61, 868-69, 875-76, 882-83, 891, 897-98, 905-06, 912, 920, 927, 934-35, 942-43, 951, 959, 966-67, 974-75, 982-83, 989, 996, 1003-04, 1012, 1019, 1027, 1033-34, 1042, 1049-50, 1056-57, 1065, 1073, 1081-82, 1089, 1096-97, 1105, 1111-12, 1118-19, 1126, 1133, 1141, 1149, 1157, 1165-66,

1172-73, 1179-80, 1187, 1193-94, 1202, 1209, 1215-16, 1223-24, 1231, 1239, 1246, 1253, 1260, 1267, 1274, 1282-83, 1289, 1297, 1304-05, 1311-12, 1320, 1328, 1335-36, 1342-43, 1351-52, 1358, 1366, 1373-74, 1380-81, 1388-89, 1397, 1404, 1410-11, 1419, 1426, 1433, 1439-40, 1447, 1454, 1461, 1469, 1477, 1485, 1491-92, 1498-99, 1507-08, 1516, 1524, 1531, 1538, 1546-47, 1554, 1561, 1567-68, 1575, 1583, 1589-90, 1597-98, 1605, 1612, 1618-19.) Approximately 88% of Plaintiffs typically began their workday between 6:00 a.m. and 9:00 a.m. (*See id*.) KeyPoint also trained Plaintiffs to perform similar duties from home before heading into the field, including confirming upcoming appointments, checking email and voicemails, scheduling interviews, planning out their routes, and/or electronically checking out case materials, and after returning home in the late afternoon or early evening, Plaintiffs would typically type reports, correct reworks, schedule interviews, check emails, perform administrative tasks, and/or electronically check in case materials. (*See* Ex. 15, ECF No. 334-5 at 2-3; Ex. 18, ECF No. 335-12 at 3 ("We know there's a lot of late-night typing and work being put in."); *see, e.g.*, Ex. 4, Brayman Dep. 43:15-25, ECF No. 335-5 at 32 (testifying that her typical schedule started with administrative tasks and that she typed reports from home when she returned from field); Ex. 4, Ponce Dep. 65:5-14, ECF No. 335-5 at 128 (work day started with emails and prep and typed for a few more hours when she returned from the field); Ex. 4, McCarthy Dep. 69:23-77:5-9, ECF No. 335-5 at 92-98 (started workday by briefing cases, making appointments, and checking emails and typed reports and checked materials back in when she returned home); *see also* Ex. 4, Carson Dep. 91:8-92:10, ECF No. 335-5 at 51-52 (started workday by prepping materials); Ex. 4, Mendez Dep. 41:10-21, ECF No. 335-5 at 112 (briefed cases, made phone calls, and scheduled appointments in the morning); Ex. 4, Carman Dep. 48:1-12, ECF No. 335-5 at 45 (briefed cases, made phone calls, and planned day before going into the field); Ex. 4, Evans Dep. 48:10-8, 50:2-9, ECF No. 335-5 at 64-

65 (reviewed case notes, materials, emails and scheduled her day before going out into the field); Ex. 4, Jones Dep. 83:6-13, 84:5-8, ECF No. 335-5 at 72-73 (checking materials out in the morning and would type from home in the evenings).) 82% of Plaintiffs continued to work in the evenings, and the majority of those Plaintiffs worked for several additional hours after 5:00 p.m. (Ex. 17, Pls.' Irog. Resps. No. 2, ECF No. 335-11 at 5, 11-12, 20, 27, 34, 40-41, 48-49, 55-56, 63, 70, 78, 85-86, 94, 100-01, 109, 115-16, 122-23, 129-30, 138, 146, 153, 159-60, 167, 173-74, 181, 189, 197, 204, 211-12, 219, 226, 234, 240-41, 247-48, 255-56, 264, 270-71, 278, 286, 292-93, 300, 307, 315, 323, 330, 337-38, 345, 351-52, 360, 368, 376, 382-83, 391, 399-400, 405-06, 414, 421, 429, 437, 445, 453, 459-60, 467, 474, 482, 489, 496-97, 503-04, 511, 518, 525-26, 533-34, 541-42, 549-50, 558, 565-66, 572-73, 581, 587-88, 594-95, 601-02, 610, 617-18, 624-25, 632, 640, 648, 655, 662, 669, 675-76, 684-85, 692-93, 700, 708, 714-15, 721-22, 730, 737, 744-45, 753, 761, 768-69, 777, 784, 790-91, 798-99, 806-07, 815-16, 822, 830, 837-38, 846, 854-55, 860-61, 868-69, 875-76, 882-83, 891, 897-98, 905-06, 912, 920, 927, 934-35, 942-43, 951, 959, 966-67, 974-75, 982-83, 989, 996, 1003-04, 1012, 1019, 1027, 1033-34, 1042, 1049-50, 1056-57, 1065, 1073, 1081-82, 1089, 1096-97, 1105, 1111-12, 1118-19, 1126, 1133, 1141, 1149, 1157, 1165-66, 1172-73, 1179-80, 1187, 1193-94, 1202, 1209, 1215-16, 1223-24, 1231, 1239, 1246, 1253, 1260, 1267, 1274, 1282-83, 1289, 1297, 1304-05, 1311-12, 1320, 1328, 1335-36, 1342-43, 1351-52, 1358, 1366, 1373-74, 1380-81, 1388-89, 1397, 1404, 1410-11, 1419, 1426, 1433, 1439-40, 1447, 1454, 1461, 1469, 1477, 1485, 1491-92, 1498-99, 1507-08, 1516, 1524, 1531, 1538, 1546-47, 1554, 1561, 1567-68, 1575, 1583, 1589-90, 1597-98, 1605, 1612, 1618-19.)

## C. Investigators Perform Background Investigations Subject to Uniform Performance Metrics Set by KeyPoint.

KeyPoint ranked investigators by level, 1 through 6, depending on their experience and classified them as "metro" or "non-metro" depending on their geography.  (Ex. 2, Corp. Dep.

93:15-94:2, ECF No. 335-3 at 20-21.) Each investigator level was subject to same three fundamental performance metrics: (1) production; (2) timeliness; and (3) quality. (*Id*. 78:5-23, ECF No. 335-3 at 17 ("A Level I has production expectations across the board."), Ex. 19, Investigator Metric Expectations, ECF No. 334-7 at 2.)

For the productivity metric, depending on the level, each investigator must complete a set number of "source units," which were the measure of productivity based on the presumed amount of effort per investigative task. (*See* Ex. 6, ECF No. 335-7 at 5 (defining source unit as "the **presumed** amount of effort required to complete an item") (emphasis in original).) KeyPoint assigned the same source unit weight to each investigative task, regardless of the actual amount of time worked to complete the task. (Ex. 20, ECF No. 335-13 at 3 (listing the source unit value of each testimony obtained and transmitted); Ex. 21, ECF No. 335-14 at 3 ("[We] don't have the data to show/support that different case/item types take varying amounts of time to complete."); Ex. 22, ECF No. 334-8 at 2 ("Most of my time is used up with driving because I'm an hour to an hour and 30 minutes away. So, by the time I get home, I've already done 5 to 6 hours of field work and not the production that matches the time spent."); Ex. 23, ECF No. 335-15 at 3 ("So I spend 8 hours to just interview the subject on a T3 or SSBI and type it up but finish my day with only 3.5 SUs.").) KeyPoint required each investigator level to produce a certain number of source units per hour. For example, a metro Level 1 investigator must produce at least 0.475 source units ("SUs") per fieldwork hour, or 17 SUs in 40 fieldwork hours per week. (Ex. 19, ECF No. 334-7 at 3.)

The timeliness metric measured the percentage of cases that an investigator transmitted by KeyPoint's deadline, or assigned completion date ("ACD"). (Ex. 2, Corp. Dep. 48:10-21, ECF No. 335-3 at 13; Ex. 20, ECF No. 335-13 at 2 ("All Investigators are held to the same timeliness standards with the expectation that you will complete 90% of your cases by their Assigned

Completion Date.").) For quality, KeyPoint measured the correctness by which investigators completed ROIs according to the federal government's investigation standards. (Ex. 2, Corp. Dep. 82:22-83:6, ECF No. 335-3 at 18-19.) KeyPoint expected that Level 1 investigators transmit at least 85% of their reports without corrections. (Ex. 19, ECF No. 334-7 at 2.)

### III.   ALL PLAINTIFFS WORKED UNPAID OVERTIME HOURS WITH DEFENDANT'S KNOWLEDGE.

KeyPoint classified all Plaintiffs as hourly non-exempt employees. (Ex. 2, Corp. Dep. 161:21-162:5, ECF No. 335-3 at 23-24.) While KeyPoint expected Plaintiffs to work overtime hours to successfully perform the functions of the job and imposed the same requirement of seeking overtime approval,[2] all Plaintiffs, regardless of investigator level, where they worked, or who their FM was, commonly allege that KeyPoint did not pay them for all of their overtime hours worked. (*See* Ex. 17, Pls.' Irog. Resps. No. 1, ECF No. 335-11 at 3, 10, 18, 25, 32, 39, 47, 54, 61, 68, 76, 84, 92, 99, 106, 114, 121, 128, 136, 144, 151, 158, 165, 172, 179, 187, 195, 202, 210, 217, 224, 232, 239, 246, 254, 262, 269, 276, 284, 291, 298, 305, 313, 321, 328, 336, 343, 350, 358, 366, 374, 381, 389, 397, 404, 412, 419, 427, 435, 443, 451, 458, 465, 472, 480, 487, 495, 502, 509, 516, 524, 532, 540, 548, 556, 564, 571, 579, 586, 593, 600, 608, 616, 623, 630, 638, 646, 653, 660, 667, 674, 682, 690, 698, 706, 713, 720, 728, 735, 743, 751, 759, 767, 775, 782, 789, 797, 805, 813, 820, 828, 836, 844, 852, 859, 867, 874, 881, 889, 896, 903, 910, 918, 925, 933, 941, 949, 957, 965, 972, 980, 987, 994, 1002, 1010, 1017, 1025, 1032, 1040, 1048, 1055, 1063, 1071, 1079, 1088, 1095, 1103, 1110, 1117, 1124, 1131, 1139, 1147, 1155, 1163, 1171, 1178, 1185, 1192, 1200, 1207, 1214, 1221, 1229, 1237, 1244, 1251, 1258, 1265, 1272, 1280, 1287, 1295, 1303,

---

[2] KeyPoint's written policies required investigators to record their time in the same electronic timekeeping system and seek preapproval of overtime hours in advance of working them. (Ex. 24, Overtime Pay Procedures, ECF No. 335-16 at 7.) FMs were responsible for reviewing investigators' timesheets. (Ex. 2, Corp. Dep. 153:2-12, ECF No. 335-3 at 22; Ex. 9, ECF No. 335-10 at 2.)

1310, 1318, 1326, 1334, 1341, 1349, 1356, 1364, 1372, 1379, 1387, 1395, 1402, 1409, 1417, 1424, 1431, 1438, 1445, 1452, 1459, 1467, 1475, 1483, 1490, 1497, 1505, 1514, 1522, 1529, 1536, 1544, 1552, 1559, 1566, 1573, 1581, 1588, 1596, 1603, 1610, 1617 (stating that Plaintiff was subject to Defendant's company-wide policy of not paying investigators for all of the overtime hours they worked); Ex. 25, ECF No. 335-17 at 2-6.)

All Plaintiffs worked unpaid overtime hours because of the same company-wide performance-based metric system, which encouraged or pressured Plaintiffs to underreport their hours. Plaintiffs commonly allege that they needed to work overtime hours to complete their regularly assigned heavy workload, including their reworks, and to meet unrealistic performance expectations. (*See id.* (stating that Plaintiffs regularly worked unpaid overtime hours to complete their workload and to keep up with KeyPoint's unrealistic production expectations and job requirements); Ex. 4, Brayman Dep. 97:13-21, ECF No. 335-5 at 35 (explaining that the "excessive amounts of work and unrealistic expectations set by KeyPoint were resulting in me working a lot of extra hours that I did not get paid for"); Ex. 4, Norton Dep. 40:18-24, ECF No. 335-5 at 120 ("The requirements they gave to us, the quotas that we had to meet, it was impossible to meet in the 40-hour time frame.").) According to the hourly production metric, if an investigator reported overtime hours without producing over their minimum production expectation, the overtime hours negatively impacted the investigator's source unit per hour ratio. To illustrate, a metro Level 1 investigator was required to produce 0.425 source units per hour. (Ex. 19, ECF No. 334-7 at 3.) If they produced 17 source units in 40 fieldwork hours, then the investigator met their minimum expectations (17 source units/40 fieldwork hours = 0.425 source units per fieldwork hour). If, however, that same investigator produced the same 17 source units but in 45 fieldwork hours instead, then the investigator's source unit per hour rating would be underperforming at 0.378 (17

source units/45 fieldwork hours). Accordingly, under the company's uniform productivity-based metric system, the inverse relationship that existed between hours worked and productivity absent production of additional source units during the overtime hours incentivized investigators to underreport their time to achieve at least their minimum performance metrics. (*See, e.g.*, Ex. 17, Pls' Irog. Resps. No. 1, ECF No. 335-11 at 18, 68-69, 92, 121, 187, 202-03, 217, 232, 299, 306, 321, 350, 359, 366, 398, 419, 458, 473, 516, 593, 600, 623, 631, 638-39, 751-52, 759-60, 775, 844, 852-53, 859, 889, 904, 910-11, 925, 981, 1017-18, 1103-04, 1155, 1200, 1221-22, 1229, 1272-73, 1287, 1350, 1356-57, 1497, 1529,  1536, 1566, 1574, 1617 (multiple Plaintiffs alleging that they were discouraged from reporting all hours worked because it would affect their source unit per hour statistics); *cf.* Ex. 26, ECF No. 334-9 at 2 ("We push production because all of you are paid at a certain level and with that Level comes expectations. We all get paid a certain amount of money based on our Level.").)

Plaintiffs' difficulty in attaining the minimum productivity requirements was conflated by their minimum timeliness and quality expectations. (*See, e.g.*, Ex. 4, Anas Dep. 112:18-113:10, ECF No. 335-5 at 12-13 ("[I]t's like a three-legged stool. There's three metrics of your performance. There's your source units, your quality, and your ACDs, and those all play into the metrics."); Ex. 4, Carman Dep. 39:4-25, ECF No. 335-5 at 43 (describing that even when Plaintiff met source unit expectations, his ACDs would suffer if he stopped work at 40 hours); Ex. 4, DuFour Dep. 72:16-73:16, ECF No. 335-5 at 58-59 (describing that even when Plaintiff exceeded source unit expectations, he was "always fighting deadlines" which required overtime hours); Ex. 4, Lugo Dep. 108:5-12, ECF No. 335-5 at 82 (workload conflated by deadlines necessitated off-the-clock work); Ex. 4, Whitaker Dep. 88:19-89:14, ECF No. 335-5 at 149-150 (describing complaint to manager that the caseload along with the ACDs was not possible to complete within

40 hours).) And, despite the minimum productivity metrics, KeyPoint required all Plaintiffs to complete time-consuming work that did not produce any source units including reworks, cancelled, referred, rescheduled, and "RT/UC" work. (*See* Ex. 27, ECF No. 335-18 at 3 (reminding investigators that to meet expectations, they should keep track of their weekly source units to ensure they do not get off track from non-source unit-credited tasks); Ex. 18, ECF No. 335-12 at 3 (acknowledging that a properly done RT/UC requires an equal level of effort as an item that was actually obtained but investigators are not provided with any source unit credit).)

In addition, Plaintiffs were encouraged or pressured to underreport their time because, pursuant to the KeyPoint's productivity-based metric system, FMs routinely required overtime hours be productive and denied overtime approval on that basis. (*See* Ex. 17, Pls. Irog. Resps. No. 1, ECF No. 335-11 at 187, 246, 398, 443, 472-73, 502, 509, 600, 630-31, 646, 698, 949, 1155-56, 1356-57, 1424-25, 1529-30, 1536, 1573-74 (multiple Plaintiffs alleging pressure to underreport overtime hours and common instructions from FMs that overtime requests would not be approved unless Plaintiffs exceeded minimum production expectation or that Plaintiffs' overtime requests were denied because Plaintiffs must complete regular workload within 40 hours).) FMs commonly reinforced the company's strict policy on overtime by regularly reminding investigators that overtime hours must be "productive," or to produce additional source units per overtime hour commensurate with their level. (Ex. 18, ECF No. 335-12 at 5 ("Moving forward, here is a reminder to always request OT before getting to or going over the 40-hour mark. We are trying to be as cost efficient as possible and want (sic) make sure anyone working OT is hitting both their weekly MESUP and then the hourly SU expectation based on your levels.") (emphasis in original); Ex. 28, ECF No. 334-10 at 2 (FM Alexandra Rizzo email stating "If you work overtime, you need to add SUs for each hour of overtime worked."); Ex. 29, ECF No. 335-19 at 2 ("We need to do our

best to manage time and production. OT will be approved minimally as we attempt to get a better handle on our productive hours."); Ex. 30, ECF No. 335-20 at 2 (FM Megan Herrity email stating "[R]emember for each hour OT you work you need .375 more SU so we just need to make sure we balance that out and make sure the OT will not negatively impact you"); Ex. 31, ECF No. 334-11 at 2 (FM Aaron Brennan email stating "I want to remind everyone that overtime is not used to catch up! OT has the same source unit expectation as your normal work hours (.375 for level 1 investigators). . . . Let's say, . . . you decide to work 2 hours of over time per day during the week. That's 10 hours of overtime that week, and if you did that for 4 weeks, that would be 40 hours of overtime time (another work week). So if your monthly expectation was 60 SUs for your normal working hours (40 hours), you now owe us an additional 15 SUs (for the additional 40 hours)"); Ex. 32, ECF No. 334-12 at 2 (FM Tim Willms email stating "Remember that [overtime] must remain productive."); Ex. 33, ECF No. 335-21 at 2 (FM Denise Bilich email stating "It's true that OT should be productive, and should be used to produce work over the expectation of your level in most cases"); *see also* Exs. 34-39, ECF No. 334-13 at 2, ECF No. 335-22 at 4, ECF No. 335-23 at 2, ECF No. 335-24 at 2, ECF No. 335-25 at 2, ECF No. 335-26 at 2.) As such, KeyPoint's FMs routinely denied requests for overtime approval unless the investigator could produce more source units during their overtime hours. (*See* Ex. 17, Pls.' Irog. Resps. No. 1, ECF No. 335-11 at 18, 39, 68-69, 84, 92-93, 158-59, 172, 179, 195, 202-03, 210, 217-18, 224, 232, 298-99, 305-06, 321-22, 350, 358-59, 366, 381, 404, 419, 516-17, 524, 548-49, 638-39, 660, 674, 743, 751-52, 759-60, 767, 844, 852-53, 859, 889-90, 903-04, 910-11, 918, 925, 980-81, 1017-18, 1103-04, 1185, 1192-93, 1200, 1214, 1221-22, 1229, 1272-73, 1287, 1341-42, 1424-25, 1490-91, 1497, 1566, 1596-97, 1617 (multiple Plaintiffs alleging that they did not record all of their overtime hours because their FMs would not approve all of the overtime hours needed).) As one FM aptly explained:

> Normally when we approve OT it is due to you working more than the minimum expectations of 17 SUs per week. ***HQ is pretty strict on us approving OT once you are on your own in the field, especially for our new investigators***. . . . When they say 17 SUs per week, that is based on 40 hour work week and the actual expectation (eventually) will be 0.425 SUs/hour. So if you were working 45 hours and only transmitting the 17 SUs, it would drop your SU per hour to 0.378, therefore 'watering' down your stats.

(Ex. 40, ECF No. 334-14 at 2.) (emphasis added) Consistent with its focus on the productivity metric, KeyPoint forecasts exactly how many source units its investigators will produce on a monthly basis, and closely tracked and monitored whether the investigators were on track or behind with their productivity expectations. (Ex. 11, ECF No. 334-1 at 2, 5 (requiring FMs to prepare a monthly performance forecast and track indicators on a daily basis to meet weekly goals); Ex. 3, Egan Dep. 85:22-86:22, ECF No. 335-4 at 18-19; Ex. 3, Jorgenson Dep. 61:13-21, ECF No. 335-4 at 46 (monitoring stats to ensure goals are met).) KeyPoint tracked all investigators' performance metrics using the same tools and systems, such as a report called "KeyMetrics" and later a centralized computer dashboard.  (Ex. 3, Pe Dep. 54:17-55:6, ECF No. 335-4 at 68-69; Ex. 11, ECF No. 334-1 at 2 (listing the IMT and FM dash as tools to manage investigators' inventory).) FMs are responsible for ensuring that investigators are meeting the company's minimum expectations and for collecting daily updates from their investigators about their work progress. (Ex. 9, ECF No. 335-10 at 2; Ex. 3, Lipp Dep. 19:11-14, ECF No. 335-4 at 57; Ex. 3, Herrity Dep. 49:13-24, ECF No. 335-4 at 33; Ex. 11, ECF No. 334-1 at 2; *see also* Ex. 3, Herrity Dep. 46:17-21, ECF No. 335-4 at 32; Ex. 41, ECF No. 335-27 at 3 (requiring daily updates from investigators); Ex. 42, ECF No. 334-15 at 2 (same).)

Investigators are ranked within their team, region, and across the company based on their source unit per hour rating.  (Ex. 3, Herrity Dep. 149:24-151:1, ECF No. 335-4 at 35-37; *see, e.g.*, Ex. 43, ECF No. 334-16 at 3.) So too are their FMs because their job performance is measured

based on the same exact three core performance metrics: productivity, timeliness, and quality. (Ex. 3, Herrity Dep. 151:10-152:3, ECF No. 335-4 at 37-38; *see, e.g.*, Ex. 44, ECF No. 334-17 at 3-4 (ranking by % Team Production); Ex. 45, Daily Life as an FM, ECF No. 334-18 at 2 (listing meeting/exceeding team MESUP as measurable metrics).) RFDs constantly inquire about the status of their FMs' metrics, in particular about productivity. (*See, e.g.*, Ex. 46, ECF No. 335-28 at 2 ("**I want a full report out on this work from those FMs you (sic) failed to get this work completed as instructed to include your plan to get It (sic) completed this week**.") (emphasis in original); Ex. 47, ECF No. 335-29 at 2 (tracking sum of daily transmissions in the region and completed work per field manager team); Ex. 48, ECF No. 337 at 2 (instructing all RFDs to collect updates from FMs on low performing investigators).)

All investigators were expected to work in KeyPoint's fast-paced changing environment and to tolerate high levels of stress. (Ex 1, pending Court permission to refile corrected exhibit per ECF No. 354.) Consistent with this environment, KeyPoint was quick to enforce its disciplinary policy for failure to meet performance metrics. (*See* Ex. 49, KeyPoint Progressive Counseling Policy, ECF No. 334-19 at 13, 16; Ex. 2, Corp. Dep. 215:2-14, ECF No. 335-3 at 25; Ex. 3, Jorgenson Dep. 134:15-135:17, 136:10-25, ECF No. 335-4 at 50-52 (describing that field managers typically consult regional field directors and Human Resources for demotion decisions); *see also* Ex. 50, ECF No. 334-20 at 3; Ex. 52, ECF No. 335-30 at 3 ("[D]o not be over cautious with managing your FIs and pulling the correct levers . . . If they are falling behind, start finding out why sooner rather than later.").) For example, KeyPoint disciplined at least 58 Plaintiffs, including through the use of a verbal warning, performance improvement plan ("PIP"), and/or a level demotion, for failure to meet performance expectations. (*See* Ex. 53, Pls.' Discipline Documents, ECF No. 350-2 at 2, 5-7, 10, 13, 16-17, 20, 23, 25-26, 29, 31, 33-35, 38-39, 42-44,

46, 48, 51, 56, 59-60, 63, 67, 70, 74-75, 78, 83-85, 87, 90, 93, 95, 97, 99, 102, 105, 107-08, 112-13, 117, 121-23, 127, 131, 134, 136, 140, 144, 147, 149, 151, 153, 155-56, 158-61, 164, 168, 172-73, 175, 178, 181, 184-85, 189, 192-94, 197-98, 200, 202, 205, 208, 212, 219.) Additionally, KeyPoint terminated 42 Plaintiffs for unsatisfactory performance related to performance metrics or failing NIT. (*See* Ex. 54, Pls.' Termination Documents, ECF No. 350-3 at 2-48.)  Even where KeyPoint did not impose discipline or termination, FMs pressured or threatened other Plaintiffs with discipline or termination for failure to meet minimum performance expectations. (Ex. 4, Anas Dep. 110:23-112:17, ECF No. 335-5 at 10-12 (describing field manager threat about formal discipline if Plaintiff did not meet her timeliness expectations); Ex. 4, Anderson Dep. 48:11-17, ECF No. 335-5 at 19 (describing "countless amount of telephone conversations" where managers threatened termination if Plaintiff did not meet minimum expectations); Ex. 4, Blair Dep. 49:11-50:1, 52:5-53:1, ECF No. 335-5 at 26-29 (describing pressure from field manager to get his work done and that if Plaintiff did not increase production, he would be terminated); Ex. 4, Carman Dep. 40:21-15, ECF No. 335-5 at 44 (describing pressure from managers, including threats of demotion, for failure to meet performance expectations); Ex. 4, Wahrer Dep. 73:1-14, ECF No. 335-5 at 142 (describing pressure from her field manager to meet her productivity levels or risk employment); Ex. 4, Lugo Dep. 155:3-156:2, ECF No. 335-5 at 83-84 (describing verbal reprimands with Plaintiff's manager when her performance metrics were below expectations); *see also* Ex. 17, Pls' Irog. Resps. No. 1, ECF No. 335-11 at 39, 121, 202-03, 217, 284-85, 366, 451, 516-17, 579, 623, 638-39,  698, 735-36, 775, 867, 918, 980-81, 1010-11, 1017-18, 1103-04, 1155-56, 1310, 1318-19, 1364-65, 1144-45, 1467, 1505-06, 1536 (multiple Plaintiffs describing common pressure or threats from FMs to maintain minimum performance metrics or else face discipline or termination).)  KeyPoint added to the high pressure environment by requiring all investigators to

sign a "Repayment Agreement," which required investigators to remain employed with the company for at least 12 months or pay KeyPoint back their training and/or clearances costs if they resigned before the end of year. (*See, e.g.*, Ex. 55, ECF No. 334-23 at 2-4.)

In short, under KeyPoint's uniform performance-based metric system, which FMs (who had responsibility for approving overtime) made sure investigators adhered to, the pressure to meet the expectations and avoid discipline or unproductive overtime resulted in Plaintiffs commonly underreporting their overtime hours. One investigator explained:

> [H]ere the thing is, the analogy is you could tell a truck driver to drive 3,000 miles in a day and that's your requirement. If you don't do it, you're going to get fired. If you – but don't work off the clock either to do those 3,000 miles in a day. So that's the same thing with KeyPoint except it's shrouded in all theses ACDs and these source units. So for source units, if I had to have at least a 4.79 (sic) or something like that, I needed to adjust – I couldn't have it look like I was working all these hours to get those numbers.

(Ex. 4, Anas Dep. 99:11-23, ECF No. 335-5 at 9.) Finally, Plaintiffs also commonly allege that KeyPoint had actual or constructive knowledge of this unpaid overtime work because KeyPoint assigned more work that could be completed in a 40-hour workweek and set the performance expectations, which were enforced by Plaintiffs' FMs. (*See* Ex. 17, Pls' Irog. Resps. No. 1, ECF No. 335-11 at 4, 10-11, 19, 26, 32-33, 39-40, 47-48, 54-55, 61-62, 69, 76-77, 84-85, 93, 99-100, 107-08, 114-15, 121-22, 129, 137, 145, 152, 158-59, 165-66, 172-73, 179-80, 188, 195-96, 203, 210-11, 218, 225, 233, 240, 247, 254-55, 263, 269-70, 277, 284-85, 299, 306, 313-14, 322, 329, 336-37, 344, 351, 359, 367, 374-75, 381-82, 390, 398, 404-05, 413, 420, 427-28, 436, 444, 451-52, 458-59, 466, 473, 481, 487-88, 495-96, 502-03, 510, 517, 524-25, 532-33, 540-41, 548-49, 557, 564-65, 571-72, 580, 587, 594, 600-01, 609, 616-17, 623-24, 631, 639, 646-47, 653-54, 661, 668, 674-75, 683, 691, 699, 707, 713-14, 720-21, 729, 735-36, 743-44, 752, 760, 767-68, 776, 783, 789-90, 797-98, 805-06, 814, 821, 829, 836-37, 845, 853, 859-60, 867-68, 874-75, 881-82,

890, 896-897, 904, 911, 918-19, 926, 933-34, 941-42, 950, 958, 965-66, 973, 981, 987-88, 995, 1003, 1011, 1018, 1026, 1032-33, 1041, 1048-49, 1055-56, 1064, 1071-72, 1080, 1088-89, 1095-96, 1104, 1110-11, 1117-18, 1125, 1132, 1140, 1147-48, 1156, 1164, 1172, 1178-79, 1186, 1193, 1200-01, 1208, 1214-15, 1222, 1230, 1238, 1245, 1252, 1259, 1266, 1273, 1281, 1288, 1296, 1303-04, 1310-11, 1319, 1326-27, 1335, 1341-42, 1350, 1357, 1365, 1372-73, 1379-80, 1387-88, 1396, 1403, 1409-10, 1418, 1425, 1432, 1438-39, 1446, 1452-53, 1459-60, 1467-68, 1476, 1484, 1490-91, 1497-98, 1506, 1515, 1523, 1530, 1537, 1545, 1553, 1560, 1566-67, 1574, 1582, 1588-89, 1596-97, 1604, 1611, 1618.)  Plaintiffs also commonly complained to their FMs and/or Human Resources about their heavy workloads and KeyPoint's unrealistic minimum performance expectations, including complaints about not being able to complete the work in a 40-hour week. (*See* Ex. 17, Pls' Irog. Resps. No. 1, ECF No. 335-11 at 4, 10-11, 19, 26, 33, 40, 47-48, 62, 69, 77, 85, 93, 100, 108, 115, 122, 129, 137, 145, 152, 159, 166, 173, 188, 196, 203, 211, 218, 225, 233, 240, 247, 255, 263, 269-70, 277, 285, 292, 299, 306, 314, 322, 329, 344, 351, 359, 367, 375, 382, 390, 398, 405, 413, 420, 427-28, 436, 444, 452, 459, 466, 473, 481, 488, 496, 503, 510, 517, 525, 533, 541, 549, 557, 565, 572, 580, 587, 601, 609, 617, 624, 631, 639, 647, 654, 661, 668, 683, 691, 699, 707, 721, 729, 736, 744, 752, 760, 768, 776, 783, 790, 797-98, 806, 814, 821, 829, 845, 853, 860, 875, 890, 897, 904, 911, 919, 926, 934, 950, 958, 966, 973, 981, 988, 995, 1011, 1018, 1026, 1033, 1041, 1049, 1056, 1064, 1072, 1080, 1096, 1104, 1111, 1125, 1132, 1140, 1148, 1156, 1164, 1172, 1179, 1186, 1193, 1201, 1208, 1215, 1222, 1230, 1238, 1245, 1252, 1259, 1266, 1273, 1281, 1288, 1296, 1304, 1311, 1319, 1327, 1335, 1342, 1350-51, 1357, 1365, 1372-73, 1380, 1396, 1403, 1410, 1418, 1432, 1446, 1453, 1460, 1468, 1476, 1484, 1491, 1498, 1507, 1515, 1523, 1530, 1537, 1545, 1553, 1560, 1567, 1574, 1582, 1589, 1597, 1604, 1611, 1618 (multiple Plaintiffs describing complaints to their field manager(s)); *see also* Ex. 4, Brayman Dep. 92:12-93:94:5,

19

ECF No. 335-5 at 33-34 (complaining to FM that Plaintiff was working a lot of extra hours due to the company's unrealistic expectations); Ex. 56, Pls' Exit Interviews, ECF No. 334-24 at 2 (Anderson ("KP is good at helping us fail rather than succeed. Too much work . . . I focus on quality, and the company is all about quantity.")), 5-6 (Arvizu ("Work expectation is tremendous. . . we are assigned more units than out (sic) work load.")), 9 (Bradford ("Assigning so many cases and no time to do it. 150% work and 75% of time to do it in. Demoralizing.")); 11 (Dale ("Impossible workload.")); 13 (Diussa ("Stress to meet metrics I couldn't keep up with.")); 15 (Fisk ("Felt like I could work 12/14 hours and still not be where I needed to be. Very overwhelming.")); 17 (Green ("Workload for FI "can't be done.""")); 27 (Levasseur-Hawkins ("So demanding. The expectation is too high.")); 29 (Lewis ("Workload is unrealistically high. Some of my cases were 1 or 2 hours away – time limits are unrealistic.")); 33 (Neal ("[I]t's just push, push, push and the workload is overwhelming. . . . Employees are treated like machines.")); 35 (Norton ("The stress level is just too high. Since December of 2015, the work has been piles on and the level of push is just too much.")); 37 (O'Connor ("Credit FIs more with the work they do: SU – 3.5 is not enough – and sets up the FI to get over assigned on work.")); 44 (Quintana ("The expectations from upper management are not possible, especially with ACD assignments. . . . I have 10-15 cases due on any given day which is impossible to meet.")); 47 (Shigo ("The company puts too much pressure to produce.")); 49 (Tresmontan ("KeyPoint is . . . falling back in to the way of morale of FIs is at its lowest point: tight deadlines, being overworked – it's a big deal right now.")).)

## **ARGUMENT**

## I.     **LEGAL STANDARD**

An FLSA action may be maintained against "any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The FLSA does not define "similarly situated." *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001). The Tenth Circuit has adopted a two-step process in certifying an FLSA collective action: (1) the initial "notice stage" to determine whether plaintiffs are "similarly situated," and (2) the second, decertification stage. *Id.* at 1102–1103.

This case is at the second step, which occurs after discovery and which examines the "disparate factual and employment settings of the individual plaintiffs." *Id.* at 1102-1103. Although the analysis is heightened at this second stage, the "similarly situated" standard under Section 216(b) is still considerably less stringent than the commonality requirements for class certification under Fed. R. of Civ. P. 23. *Avendano v. Averus, Inc.*, 2015 WL 1529354, at *4 (D. Colo. Mar. 31, 2015) (citing *Pegues v. CareCentrix, Inc.*, 2013 WL 1896994, at *1 (D. Kan. May 6, 2013)). Importantly, Plaintiffs need only show they are similar, not identical. *Bass v. PJComn Acquisition Corp.*, 2010 WL 3720217, at *2 (D. Colo. Sept. 15, 2010); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008) ("Although certification requires a factual nexus, plaintiffs in an FLSA collective action need not be situated identically."); *LaFleur v. Dollar Tree Stores, Inc.*, 30 F. Supp. 3d 463, 474 (E.D. Va. Mar. 7, 2014) ("A collective action does not necessitate that there be no differences among class members, nor does it prohibit individualized inquiry in connection with fashioning the specific relief or damages to be awarded to each class member.").

District courts typically address three factors when determining whether FLSA plaintiffs may proceed as a collective: (1) the disparate factual and employment settings of individual plaintiffs; (2) various defenses available to defendant which appear to be individual to each

plaintiff; and (3) fairness and procedural considerations. *Lozoya v. All Phase Landscape Constr., Inc.*, 2014 WL 222104, at *1 (D. Colo. Jan. 21, 2014). These factors should be balanced with the fundamental purpose of collective actions, which is to lower costs through the pooling of resources and to limit the controversy to one proceeding to efficiently resolve common issues of law and fact that arise from the same illegal activity. *See id.* at *4 (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

## II.   PLAINTIFFS SHARE SIMILAR FACTUAL AND EMPLOYMENT SETTINGS.

### A.   Plaintiffs Are Subject to Defendant's Uniform Practice of Underpaying Investigators for the Overtime Hours They Worked.

KeyPoint's uniform FLSA violation warrants final certification of the collective action. Plaintiffs are sufficiently similarly situated to proceed to trial as a representative group where the evidence shows that they were subject to common unlawful policies. *See, e.g.*, *Monroe v. FTS USA, LLC*, 860 F.3d 389, 403 (6th Cir. 2017) ("[N]either the statutory language nor the purposes of the FLSA collective actions require a violating policy to be implemented by a single method. . . . Such a narrow interpretation snubs the purpose of FLSA collective actions."); *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008) (common practices of plaintiff assistant store managers working off-the-clock or having time shaved off their timesheets, as well as employer's general policy requiring plaintiffs to perform job duties within 40 hours where that was not easily attainable supported denying decertification); *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 84 (10th Cir. 1983) (employer failed to compensate for overtime both before and after work, at different locations).

As described above, Plaintiffs were subject to a uniform FLSA violation: KeyPoint's failure to compensate investigators for all overtime hours worked.  (Ex. 17, Pls.' Irog. Resps. No. 1, ECF No. 335-11 at 3, 10, 18, 25, 32, 39, 47, 54, 61, 68, 76, 84, 92, 99, 106, 114, 121, 128, 136,

144, 151, 158, 165, 172, 179, 187, 195, 202, 210, 217, 224, 232, 239, 246, 254, 262, 269, 276,

284, 291, 298, 305, 313, 321, 328, 336, 343, 350, 358, 366, 374, 381, 389, 397, 404, 412, 419,

427, 435, 443, 451, 458, 465, 472, 480, 487, 495, 502, 509, 516, 524, 532, 540, 548, 556, 564,

571, 579, 586, 593, 600, 608, 616, 623, 630, 638, 646, 653, 660, 667, 674, 682, 690, 698, 706,

713, 720, 728, 735, 743, 751, 759, 767, 775, 782, 789, 797, 805, 813, 820, 828, 836, 844, 852,

859, 867, 874, 881, 889, 896, 903, 910, 918, 925, 933, 941, 949, 957, 965, 972, 980, 987, 994,

1002, 1010, 1017, 1025, 1032, 1040, 1048, 1055, 1063, 1071, 1079, 1088, 1095, 1103, 1110, 1117,

1124, 1131, 1139, 1147, 1155, 1163, 1171, 1178, 1185, 1192, 1200, 1207, 1214, 1221, 1229, 1237,

1244, 1251, 1258, 1265, 1272, 1280, 1287, 1295, 1303, 1310, 1318, 1326, 1334, 1341, 1349, 1356,

1364, 1372, 1379, 1387, 1395, 1402, 1409, 1417, 1424, 1431, 1438, 1445, 1452, 1459, 1467, 1475,

1483, 1490, 1497, 1505, 1514, 1522, 1529, 1536, 1544, 1552, 1559, 1566, 1573, 1581, 1588, 1596,

1603, 1610, 1617.)   This violation permeated the workforce nationwide—across geographic

regions and managers—due to the common over-assignment of work strategy and minimum

performance expectations that encouraged or pressured Plaintiffs to underreport their hours. (*Id.*)

Plaintiffs commonly felt discouraged from reporting all of their overtime hours because of the

effect on their source units per hour productivity ratio. (Ex. 17, Pls' Irog. Resps. No. 1, ECF No.

335-11 at 18, 68-69, 92, 121, 187, 202-03, 217, 232, 299, 306, 321, 350, 359, 366, 398, 419, 458,

473, 516, 593, 600, 623, 631, 638-39, 751-52, 759-60, 775, 844, 852-53, 859, 889, 904, 910-11,

925, 981, 1017-18, 1103-04, 1155, 1200, 1221-22, 1229, 1272-73, 1287, 1350, 1356-57, 1497,

1529, 1536, 1566, 1574, 1617.) Field managers across regions instructed investigators that for each

hour recorded, including overtime, they must produce additional source units per hour to be at

expectation. (Exs. 18, 28-39, ECF No. 335-12 at 5, ECF No. 335-19 at 2, ECF No. 334-10 at 2,

ECF No. 335-20 at 2, ECF No. 334-11 at 2, ECF No. 334-12 at 2, ECF No. 335-21, ECF No. 334-

13 at 2, ECF No. 335-22 at 4, ECF No. 335-23 at 2, ECF No. 335-24 at 2, ECF No. 335-25 at 2, ECF No. 335-26 at 2.) Plaintiffs needed to work the overtime hours just to try to meet the expectations, not exceed them. (Ex. 4, Brayman Dep. 97:13-21, ECF No. 335-5 at 35; Ex. 17, Pls.' Irog. Resps. No. 1, ECF No. 335-11 at 3, 10, 18, 25, 32, 39, 47, 54, 61, 68, 76, 84, 92, 99, 106, 114, 121, 128, 136, 144, 151, 158, 165, 172, 179, 187, 195, 202, 210, 217, 224, 232, 239, 246, 254, 262, 269, 276, 284, 291, 298, 305, 313, 321, 328, 336, 343, 350, 358, 366, 374, 381, 389, 397, 404, 412, 419, 427, 435, 443, 451, 458, 465, 472, 480, 487, 495, 502, 509, 516, 524, 532, 540, 548, 556, 564, 571, 579, 586, 593, 600, 608, 616, 623, 630, 638, 646, 653, 660, 667, 674, 682, 690, 698, 706, 713, 720, 728, 735, 743, 751, 759, 767, 775, 782, 789, 797, 805, 813, 820, 828, 836, 844, 852, 859, 867, 874, 881, 889, 896, 903, 910, 918, 925, 933, 941, 949, 957, 965, 972, 980, 987, 994, 1002, 1010, 1017, 1025, 1032, 1040, 1048, 1055, 1063, 1071, 1079, 1088, 1095, 1103, 1110, 1117, 1124, 1131, 1139, 1147, 1155, 1163, 1171, 1178, 1185, 1192, 1200, 1207, 1214, 1221, 1229, 1237, 1244, 1251, 1258, 1265, 1272, 1280, 1287, 1295, 1303, 1310, 1318, 1326, 1334, 1341, 1349, 1356, 1364, 1372, 1379, 1387, 1395, 1402, 1409, 1417, 1424, 1431, 1438, 1445, 1452, 1459, 1467, 1475, 1483, 1490, 1497, 1505, 1514, 1522, 1529, 1536, 1544, 1552, 1559, 1566, 1573, 1581, 1588, 1596, 1603, 1610, 1617.) What is more, field managers pressured and threatened investigators to perform using the company's disciplinary policy to enforce the minimum expectations. (Ex. 17, Pls' Irog. Resps. No. 1, ECF No. 335-11 at 39, 121, 202-03, 217, 284-85, 366, 451, 516-17, 579, 623, 638-39, 698, 735-36, 775, 867, 918, 980-81, 1010-11, 1017-18, 1103-04, 1155-56, 1310, 1318-19, 1364-65, 1144-45, 1467, 1505-06, 1536.)

### B.     Plaintiffs Work in the Same Job Position and Share Job Duties.

Regardless of their supervisor, geographic area, or level, Plaintiffs shared the same primary job duty: performing background investigations. District courts have denied decertification or

granted final certification where despite varying geographic locations or supervisors, plaintiffs share the same job title, work under the same job description, and share the same supervision hierarchy. *See, e.g.*, *Monroe*, 860 F.3d at 402 (affirming denial of decertification where plaintiffs worked in the same position, with the same duties, and under the same pay plan); *Reinig v. RBS Citizens NA*, 2017 WL 8941217, at *15 (W.D. Pa. Aug. 2, 2017) (recommending final certification where mortgage loan officers shared the same job description and performed the same tasks, despite performing these tasks in different locations in different states for different managers), *adopted* Dkt. 216, 2:15-cv-01541-AJS (Aug. 22, 2017); *Falcon*, 580 F. Supp. 2d at 536 (plaintiff assistant store managers nationwide "held the same job title and worked under the exact same job description and supervision hierarchy").

Here, Plaintiffs received the same new investigator training, performed the same core fieldwork and administrative tasks. (Ex. 2, Corp. Dep. 22:21-23, 63:5-18, ECF No. 335-3 at 9-10, 15.) Further, Plaintiffs performed their work subject to the same job description, same guidelines and directives to comply with federal government standards in performing background investigations, and other KeyPoint best practices. (Ex. 2, Corp. Dep. 47:2-13, 77:18-78:4, ECF No. 335-3 at 12, 16-17.) Plaintiffs' common job duties weighs in favor of final certification.

### C.     Defendant Imposes Uniform Assignment Strategies and Similar Performance Expectations on Plaintiffs.

Not only did Plaintiffs share the same job duties, but KeyPoint also subjected Plaintiffs to centralized assignment strategies and uniform minimum performance expectations. Courts have denied decertification motions where an employer imposes uniform performance requirements that force employees to work off-the-clock.  *See Brennan v. Qwest Comm'cns Int'l, Inc.*, 2009 WL 1586721, at *5 (D. Minn. June 4, 2009) (denying decertification where plaintiffs alleged that they were subject to minimum performance standards that led to off-the-clock work); *Falcon*, 580 F.

Supp. 2d at 528 (finding that plaintiffs' showing that defendant's policy of requiring them to perform job duties that could not easily be completed within 40 hours while also discouraging overtime supported denial of decertification); *Wilks v. Pep Boys*, 2006 WL 2821700, at *6 (M.D. Tenn. Sept. 26, 2006) (denying decertification because pressures to complete job duties subject to stringent productivity requirements and conflicting pressure not to work overtime was a unifying unlawful overtime practice); *Hill v. Muscogee Cty. Sch. Dist.*, 2005 WL 3526669, at *3 (M.D. Ga. Dec. 20, 2005) (denying decertification where plaintiffs alleged that they were commonly assigned work that they could not complete within scheduled work hours).

Here, the evidence reflects that KeyPoint imposed uniform company-wide assignment strategies and minimum performance expectations, depending on the investigator's level, and the company closely monitored all investigator performance on a regular basis and using the same data and tools. (Ex. 19, ECF No. 334-7 at 2; Ex. 3, Egan Dep. 16:16-17:3, ECF No. 335-4 at 14-15; Ex. 11, ECF No. 334-1 at 2.) Failure to adhere to these minimum expectations resulted in discipline or termination in accordance with KeyPoint's progressive discipline policy.  (*See* Ex. 49, ECF No. 334-19 at 13, 16; Ex. 53, ECF No. 350-2 at 2, 5-7, 10, 13, 16-17, 20, 23, 25-26, 29, 31, 33-35, 38-39, 42-44, 46, 48, 51, 56, 59-60, 63, 67, 70, 74-75, 78, 83-85, 87, 90, 93, 95, 97, 99, 102, 105, 107-08, 112-13, 117, 121-23, 127, 131, 134, 136, 140, 144, 147, 149, 151, 153, 155-56, 158-61, 164, 168, 172-73, 175, 178, 181, 184-85, 189, 192-94, 197-98, 200, 202, 205, 208, 212, 219; Ex. 54, ECF No. 350-3 at 2-48.) Investigators performed their work within the same parameters and according to the same expectations.

### D.   Pursuant to Defendant's Best Practices Communicated to Investigators, Plaintiffs Worked Similar Schedule Structure.

Plaintiffs also performed their investigative work in a similar scheduling structure.  Courts have found that broad similarities in when employees perform work may support final

certification. *See, e.g.*, *Reinig*, 2017 WL 8941217, at *15 (granting final certification where mortgage loan officers shared the same job duties and were subject to the same unlawful policy that led to off-the-clock work, despite plaintiffs having the flexibility to determine their own working hours and where to perform their work); *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 308 (D. Md. 2014) (agreeing with plaintiffs that employer's expectation that plaintiff satellite installers work at least five days a week supported denial of decertification).

Significantly, though, employees' work schedules need not be identical. In other words, courts do not require that the precise start and stop times during each work day be the same for a single employee or across employees because such variations are immaterial in determining whether employees are similarly situated. As one court noted,

> [Defendant] exaggerates the factual differences among employees on various shifts and in different departments. If one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends [on preparatory work at or before the start of her shift] on Monday will differ, at least minutely, from the amount of time that she spends [on such preparatory work] on Tuesday.

*Brennan*, 2009 WL 1586721, at *4 (quoting *Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007)); *see also McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 368 (S.D.N.Y. 2014) (rejecting defendant's argument that individual variations in schedules, days worked, and actual hours worked per day mandated decertification).

Here, Plaintiffs adhered to the same scheduling patterns, consistent with how they were trained. Each Plaintiff typically worked Monday through Friday, performed the majority of their fieldwork (i.e., interviews and record pulls) during normal business hours, and wrote reports at home in the evening. (Ex. 13, ECF No. 334-3 at 3; Ex. 14, ECF No. 334-4 at 4; Ex. 3, Bowen Dep. 87:5-10, ECF No. 335-4 at 8; Ex. 17, Pls.' Irog. Resps. No. 2, ECF No. 335-11 at 5, 11-12, 20, 27, 34, 40-41, 48-49, 55-56, 63, 70, 78, 85-86, 94, 100-01, 109, 115-16, 122-23, 129-30, 138,

146, 153, 159-60, 167, 173-74, 181, 189, 197, 204, 211-12, 219, 226, 234, 240-41, 247-48, 255-56, 264, 270-71, 278, 286, 292-93, 300, 307, 315, 323, 330, 337-38, 345, 351-52, 360, 368, 376, 382-83, 391, 399-400, 405-06, 414, 421, 429, 437, 445, 453, 459-60, 467, 474, 482, 489, 496-97, 503-04, 511, 518, 525-26, 533-34, 541-42, 549-50, 558, 565-66, 572-73, 581, 587-88, 594-95, 601-02, 610, 617-18, 624-25, 632, 640, 648, 655, 662, 669, 675-76, 684-85, 692-93, 700, 708, 714-15, 721-22, 730, 737, 744-45, 753, 761, 768-69, 777, 784, 790-91, 798-99, 806-07, 815-16, 822, 830, 837-38, 846, 854-55, 860-61, 868-69, 875-76, 882-83, 891, 897-98, 905-06, 912, 920, 927, 934-35, 942-43, 951, 959, 966-67, 974-75, 982-83, 989, 996, 1003-04, 1012, 1019, 1027, 1033-34, 1042, 1049-50, 1056-57, 1065, 1073, 1081-82, 1089, 1096-97, 1105, 1111-12, 1118-19, 1126, 1133, 1141, 1149, 1157, 1165-66, 1172-73, 1179-80, 1187, 1193-94, 1202, 1209, 1215-16, 1223-24, 1231, 1239, 1246, 1253, 1260, 1267, 1274, 1282-83, 1289, 1297, 1304-05, 1311-12, 1320, 1328, 1335-36, 1342-43, 1351-52, 1358, 1366, 1373-74, 1380-81, 1388-89, 1397, 1404, 1410-11, 1419, 1426, 1433, 1439-40, 1447, 1454, 1461, 1469, 1477, 1485, 1491-92, 1498-99, 1507-08, 1516, 1524, 1531, 1538, 1546-47, 1554, 1561, 1567-68, 1575, 1583, 1589-90, 1597-98, 1605, 1612, 1618-19.)  Plaintiffs' similar scheduling warrants final certification.

## III.   NONE OF DEFENDANT'S DEFENSES WARRANTS DECERTIFICATION.

### A.   Defendant Will Assert Common Defenses to Plaintiffs' Claims.

KeyPoint's primary defenses in this litigation are that Plaintiffs did not work unpaid overtime and if they did, that KeyPoint did not know and should not have known about it. (*See* Ans. to Am. Compl. ¶¶ 15–16, ECF No. 277.) However, these defenses do not require individualized treatment. Plaintiffs anticipate that KeyPoint will argue that *none* (not some) of the Plaintiffs worked off-the-clock and that KeyPoint had *no* knowledge of *any* Plaintiffs working off-the-clock if they did. These defenses will be uniformly applied to every Plaintiffs. At trial,

KeyPoint may cross-examine each representative Plaintiff at trial about their hours worked, and KeyPoint may present its own witnesses and evidence to show whether the company knew or should have known about Plaintiffs' unpaid overtime hours.

District courts have agreed that these same defenses are not reasons for decertifying a collective action similar to this one. *See, e.g.*, *LaFleur*, 30 F. Supp. 3d at 474 (rejecting argument that defenses to off-the-clock work did not require individualized proof because plaintiffs' claims rest on common issues); *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 995 (W.D. Tenn. 2011) (rejecting argument that defense of no actual or constructive knowledge can only be raised individually and  holding that the use of representative evidence would not impair defendant's ability to raise defenses); *Falcon*, 580 F. Supp. 2d at 540 (determining that whether defendant had actual or constructive knowledge of any off-the-clock work was a defense that could adequately be raised at trial involving representative testimony).

### B.    Variances in Plaintiffs' Overtime Estimates Do Not Justify Decertification.

Plaintiffs anticipate that KeyPoint will argue that the variances in how many overtime hours each Plaintiff worked justifies decertification.  On the contrary, evidence of the number of overtime hours worked is a question for damages and not a basis for decertification. *Clark v. Centene Co. of Tex.*, 44 F. Supp. 3d 674, 690 (W.D. Tex. 2014); *see also Belloso v. Asplundh Tree Expert, Co.*, 2019 WL 3383533, at *4 (M.D. Fla. May 22, 2019) (rejecting argument that varying amounts of overtime worked supports decertification because amount of overtime goes to damages); *Underwood v. NMC Mort'g Corp.*, 2009 WL 1322588, at *4 (D. Kan. May 11, 2009) (determining that whether each plaintiff worked overtime hours and the amount goes to damages and is "not sufficient to defeat the propriety of a collective action"). Here, too, Plaintiffs' variances in the amount of overtime hours worked per week is not an obstacle to final certification.

Regardless of any such variances in the number of overtime hours worked, Plaintiffs' trial plan will address them in a single formula. *See infra* Section V.

### C. Any So-Called Discretion in Overtime Approval by Field Managers Is Limited in Significant Ways.

Plaintiffs anticipate that KeyPoint will argue that overtime approval was subject to field manager discretion, rendering decertification appropriate. However, in reality, any so-called discretion exercised by field managers was significantly limited by KeyPoint's uniform overtime practices that resulted in a common FLSA violation.

The evidence demonstrates that KeyPoint directed field managers' approval of overtime through its company-wide minimum performance expectations. (Ex. 19, ECF No. 334-7 at 3; Ex. 18, ECF No. 335-12 at 5; Ex. 28, ECF No. 334-10 at 2; Ex. 29, ECF No. 335-19 at 2; Ex. 30, ECF No. 335-20 at 2; Ex. 31, ECF No. 334-11 at 2; Ex. 32, ECF No. 334-12 at 2; Ex. 33, ECF No. 335-21 at 2; *see also* Exs. 34-39, ECF No. 334-13 at 2, ECF No. 335-22 at 4, ECF No. 335-23 at 2, ECF No. 335-24 at 2, ECF No. 335-25 at 2, ECF No. 335-26 at 2.) Courts have distinguished between managerial discretion that is untethered by a companywide policy and limited discretion that flows from consistent, policy-driven practices. *Compare Mahoney v. Farmers Ins. Exchange*, 2011 WL 4458513, at *7-9 (S.D. Tex. Sept. 23, 2011) (finally certifying FLSA collective action where substantial evidence that supervisors across various locations pressured auto physical damage claims representative plaintiffs to work off-the-clock and rejecting defendant's argument that each plaintiff was subject to the supervisors' respective practices toward overtime) *with Oldershaw v. DaVita Healthcare Partners, Inc.*, 2019 WL 427650, at *5-8 (D. Colo. Feb. 4, 2019) (decertifying claims where plaintiffs who worked in a variety of positions merely provided anecdotal evidence that some facility administrators at some locations discouraged overtime and a vague theory that defendant budgets for its labor hours and suppresses overtime); *see also Wilks*,

2006 WL 2821700, at *14–15 (finding decertification inappropriate where evidence suggested that stringent productivity requirements subjected employees to common, unlawful timekeeping and overtime practices that conflicted with the company's official written overtime policy).

The present case is not about sporadic instances of overtime denials, but rather, a workplace practice of not paying investigators for all of their overtime hours. Importantly, courts do not require that managers act in an identical fashion. *See, e.g.*, *Falcon*, 580 F. Supp. 2d at 536 (finding that assistant store managers (ASMs) "made a strong showing that [defendant's] general policy of requiring ASMs to perform job duties that could not easily be completed within 40 hours while, at the same time, strongly discouraging overtime, . . . created an environment that at least strongly motivated managers to commit the alleged FLSA violations"); *Monroe*, 860 F.3d at 404 (affirming denial of decertification where plaintiffs' claims were unified by common theories that executives implemented a single, company-wide time-shaving policy, either through direct orders or through pressure from supervisors); *see also Thompson v. Bruister & Assocs., Inc.*, 967 F. Supp. 2d 1204, 1220 (M.D. Tenn. 2013) ("Rare would be the collective action–or class action for that matter– where the employees labored under the exact same circumstances.").

## IV.    FAIRNESS AND PROCEDURAL CONCERNS WEIGH HEAVILY IN FAVOR OF GRANTING FINAL CERTIFICATION.

Fairness and procedural concerns weigh in favor of a single, collective trial.  The collective action mechanism has an important remedial purpose: (1) to lower costs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues arising from the same alleged activity.  *Lozoya v. All Phase Landscape Constr., Inc.*, 2014 WL 222104, at *4 (D. Colo. Jan. 21, 2014) (citing *Hoffmann-La Roche*, 493 U.S. at 170); *Charbonneau v. Mort'g Lenders of Am. L.L.C.*, 2021 WL 84171, at *8 (D. Kan. Jan. 11, 2021) ("[C]ollective adjudication satisfies the policy behind FLSA collective actions and Congress's

remedial intent by consolidating many small, related claims for which proceeding individually would be too costly to be practical.") (citing *Monroe*, 860 F.3d at 405).

Here, this action may be efficiently resolved in one proceeding with the same core evidence because it entails FLSA violations stemming from common theories of liability, regardless of location and field manager. *See Underwood v. NMC Mort'g Corp.*, 2009 WL 1322588, at *5 (D. Kan. May 11, 2009) (denying decertification regardless of some individualized fact determinations because one lawsuit was preferable to individualized lawsuits "at square one without the benefit of pooled resources"); *Falcon*, 580 F. Supp. 2d at 541 (denying decertification in an off-the-clock case where given the substantial similarity of the putative class members' claims, 355 individual trials would not serve judicial economy). In contrast, if the Court decertified this action, 211 individual workers would be forced to refile the same overtime claim against KeyPoint in district courts across the country where each Plaintiff worked or right back here in this district court where KeyPoint is headquartered. Plaintiffs, particularly those individuals employed for only a few months, may not have the financial means to individually vindicate their rights. *Lozoya*, 2014 WL 222104, at *4 (citing the cost of litigation on an individual basis as an entry barrier for individuals unable to pay litigation costs on their own to be a factor weighing in favor of final certification).

Finally, as described above, KeyPoint's due process rights are not hampered by a single, consolidated trial. An employer does not have an absolute right to defend against wage and hour claims on an individual basis. *See, e.g.*, *Monroe*, 860 F.3d at 404 (no right to cross-examine each plaintiff on hours worked); *See also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1278– 79 (11th Cir. 2008) (explaining that *Mt. Clemens Pottery* and its progeny have confirmed a "general rule that not all employees have to testify" in a collective action).

Therefore, fairness and procedural considerations weigh in favor of final certification.

## V.       PLAINTIFFS' PROPOSED TRIAL PLAN SUPPORTS FINAL CERTIFICATION.

Plaintiffs submit the following proposed trial plan outlining the process for how this collective action may be tried in a way that ensures a fair and efficient resolution of Plaintiffs' claims and Defendant's defenses.[3]

At trial, Plaintiffs will bear the burden to prove that they worked unpaid overtime hours with Defendant's knowledge and the amount and extent of those hours. In *Anderson v. Mt. Clemens Pottery Co.*, the Supreme Court held:

> Where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of the work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate.

328 U.S. 680, 687-88 (1946); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 422, 456 (2016) ("Instead of punishing 'the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work,' the Court held 'an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'") (quoting *Mt. Clemens*, 328 U.S. at 687).

Given the significant overlap between liability and damages and Plaintiffs' similarly situated nature, Plaintiffs' claims should be tried in a single trial with representative testimony for both liability and damages, a well-settled method in FLSA collective actions. *Monroe v FTS USA, LLC*, 860 F.3d 389, 393 (6th Cir. 2017) ("Upon reconsideration, we find that . . . *Tyson*'s

---

[3] Plaintiffs reserve the right to amend this trial plan.

ratification of the *Mt. Clemens* legal framework and validation of the use of representative evidence support our original decision."); *Garcia v. Tyson Foods, Inc.*, 770 F.3d 1300, 1307 (10th Cir. 2014) (finding that plaintiffs did not need to individualize proof of under-compensation after final certification and that the jury could reasonably rely on representative evidence to determine class-wide liability due to employer's failure to record all hours worked); *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) ("[N]ot all injured employees need testify to establish a prima facie case as a matter of 'just and reasonable inference.'"). Trial in this fashion will be efficient, cost-effective, and the least burdensome for the parties and the Court and will further the FLSA's broad remedial purpose.

At trial, Plaintiffs intend to present the testimony of the named and 25 representative Plaintiffs.[4] These testifying Plaintiffs represent various geographic locations, managers, and periods of employment. Defendant cannot claim any unfairness or prejudice because it had full access to these Plaintiffs, will have an opportunity to cross-examine them, and may present its own witnesses and evidence. *See Wilks*, 2006 WL 2821700, at *7 (defendant was not prejudiced by not being able to cross-examine each plaintiff in an off-the-clock case because it may present evidence, cross-examine individual plaintiffs, and call other witnesses to defend its policies and procedures at a single trial); *Monroe*, 763 F. Supp. 2d at 995-996 (noting that many of defendants' purported defenses were "clearly amenable to classwide determination" and rejecting defendant's claim that whether it had knowledge of plaintiffs' unpaid overtime could not proceed collectively). Additionally, Plaintiffs also intend to call several managers and corporate witnesses in their case-in-chief. If this Court determines that Plaintiffs have not presented sufficient evidence for the jury

---

[4] For the sake of judicial economy, and to save the parties' time and resources, Plaintiffs would be willing to consider limiting the time length of each Plaintiff's testimony at trial.

to decide liability and damages for the collective, then the Court may require Plaintiffs to present more evidence. (Fed. R. Evid. 611(c).) Likewise, if after hearing some Plaintiffs testify, the Court decides that testimony from all representative Plaintiffs is unnecessary, cumulative, duplicative, or otherwise a waste of the jury's time (*see* Fed. R. Evid. 403), the Court may limit additional Plaintiff testimony.

Damages may be calculated post trial. The jury will be asked to decide whether Plaintiffs worked uncompensated overtime hours and, if so, whether Defendant knew or should have known about it. If these questions are decided for Plaintiffs, the jury will then determine how many weekly uncompensated hours the representative Plaintiffs worked on average. (*See, e.g.*, Ex. 57, ECF No. 335-32 at 3.) Then, using Defendant's weekly payroll data and the jury-determined average weekly unrecorded hours figure, calculating damages for testifying and non-testifying Plaintiffs would be calculated as follows: **Regular Rate x 1.5 x Unrecorded Overtime Hours = Unpaid Overtime**. Post-trial damages calculations have routinely been adopted in FLSA collective actions. *See Monroe*, 860 F.3d at 408–09 (approving the estimated average approach used to calculate damages where the jury determined the number of unrecorded hours worked by the testifying plaintiffs and applied the average to non-testifying plaintiffs post trial); *Maliza v. 2001 Mar-os Fashion Inc.*, 2010 WL 502955 (E.D.N.Y. Feb. 10, 2010) (after the jury determined the hours worked and wages, plaintiff submitted damages calculations to the court).[5]

## CONCLUSION

For all of these reasons, this Court should grant final certification of the FLSA collective.

---

[5] The parties would reach agreement about the damage calculation for each Plaintiff, or if legal or factual issues arise, these issues may be resolved by the Court or a special master.

Dated: December 31, 2021

*s/ Rachhana T. Srey*
Rachhana T. Srey
Caroline Elizabeth Bressman
Reena I. Desai
H. Clara Coleman
Daniel S. Brome
NICHOLS KASTER, PLLP
80 South 8th Street
IDS Center, Suite 4700
Minneapolis, MN  55402
Phone: 612-256-3264
Fax: 612-338-4878
srey@nka.com
cbressman@nka.com
desai@nka.com
ccoleman@nka.com
dbrome@nka.com

Benjamin L. Davis, III
George E. Swegman
THE LAW OFFICES OF PETER T. NICHOLL
36 South Charles Street, Suite 1700
Baltimore, MD  21201
bdavis@nicholllaw.com
gswegman@nicholllaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


I hereby certify that on_____December 31, 2021_____, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

mphogan@littler.com
jkalk@littler.com
jharpole@littler.com
tcarroll@littler.com
dvankatwyk@littler.com
mgomez@littler.com
cchristensen@littler.com


s/Rachhana T. Srey_____
**Rachhana T. Srey**
**Caroline E. Bressman**
NICHOLS KASTER, PLLP
4700 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
Email: srey@nka.com
        cbressman@nka.com

Attorneys for Plaintiffs